Eli BABICH, Petitioner

v.

WORKERS' COMPENSATION AP-PEAL BOARD (CPA DEPARTMENT OF CORRECTIONS), Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 7, 2007.
Decided April 12, 2007.

Vincent J. Quatrini, Jr., Greensburg, for petitioner.

James A. Mazzotta, Pittsburgh, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, SMITH-RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Eli Babich (Claimant) appeals from an order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) denying his claim petition because he failed to show that he suffered either a psychological or physical injury as a result of an abnormal working condition while employed by the Pennsylvania State Department of Corrections (Employer).

Claimant began working as a Registered Nurse 2 for Employer at the State Correctional Institution at Pittsburgh (SCI–Pittsburgh), a maximum security prison, on April 19, 1999. On October 30, 2001, Claimant filed a claim petition alleging that he suffered post-traumatic stress disorder on July 23, 2001 (a mental/mental claim), as a result of numerous traumatic incidents involving inmates. Employer filed a timely answer denying the allegations.

Before the WCJ, Claimant testified that when he began working for Employer, he was assigned to work in the restricted housing unit areas of SCI–Pittsburgh where the prisoners were kept in solitary confinement;[1] the long-term segregation unit (LTSU), where the "worst of the worst" convicts were kept; and the special needs unit where allegedly the "criminally insane" were housed. His job was to go through those areas of the prison and give

---

[1] Claimant testified that the restricted housing unit was actually comprised of three rows. A–1 was for solitary confinement; "going down to get hole time for doing bad stuff out in the yard." A–2 was also solitary confinement and also disciplinary confinement for guys "who could not stay out in the yard and for administrative reasons." A–3 was the LTSU unit. (Reproduced Record at 29a.)

the prisoners their medications. He explained that he dealt with all three levels of prisoners in those different areas of the prison because those were the areas where Employer mostly put him to work. Claimant described that what caused him to start having anxiety attacks and caused him to seek psychiatric treatment were not only daily events, but specific events as well. They included inmates swearing at him regularly and threatening him and his family frequently. The inmates also threw urine and feces on him several times, and he did not know if he had been exposed to HIV from the liquid because Employer would not release a prisoner's personal information. As a result of at least one of those episodes, Claimant stated that he went to Allegheny General Hospital for blood work and hepatitis screening. Claimant also testified that there was an incident involving an inmate (Jones) who mutilated his own testicles where Claimant had to medically attend to the one remaining mangled testicle and retrieve the other one from the prison's floor. Claimant also mentioned an incident with an inmate (Hines) who cut his jugular vein in half and whom Claimant temporarily revived, but later died, for which Claimant received a commendation letter. Claimant stated that the last incident involved an encounter he had with an irate inmate who alleged Claimant did not give him his medicine. Because Claimant started swearing at the prisoner and was having a shouting match with him, he was reprimanded by Employer for inappropriate conduct, and a few days later on July 23, 2001, he was told not to report back to work until he sought psychiatric care and received an evaluation. Claimant stated that he never returned to work at SCI–Pittsburgh and was receiving treatment from P. Christopher Coburn, Ph.D (Dr. Coburn), and medication from Swami Nathan, M.D. (Dr. Nathan) in the form of an antidepressant,

antipsychotic medication and a minor tranquilizer. He also indicated that he returned to work in March 2002 at a nursing home facility where he enjoyed working four days a week, 32 hours per week, which was considered full-time in the nursing profession.

On cross-examination, Claimant testified that before working at SCI–Pittsburgh, he had worked at the Allegheny County Jail where there were also dangerous prisoners, but he never had to deal with the kind of inmate problems he had at SCI–Pittsburgh. However, Claimant admitted that he signed an employment application for SCI–Pittsburgh that had a paragraph stating that there was an advisory to employees that correctional employees worked under unique, demanding and sometimes dangerous conditions, and it was imperative that all new employees received training that prepared them to handle various situations that might occur in a prison environment. Claimant stated that he received about three weeks of safety and defense tactics training. Claimant also admitted that he was aware when he submitted his application to SCI–Pittsburgh that some of the people he would be working with would be dangerous. He also stated that when a nurse went around passing out medication, the atmosphere was one of a zoo, and in the LTSU, it was like that every day. As for having urine and feces thrown at him, which he alleged occurred two or three times, he admitted not only that there were other nurses that worked at SCI–Pittsburgh who experienced the same thing, but it also happened to one of his friends.

In support of his claim petition, Claimant offered the expert medical testimony of Dr. Coburn, a psychologist, who indicated that Claimant was referred to him by the State Employee Assistance Program because they were looking for a "fitness

for duty" evaluation at that point. Dr. Coburn initially diagnosed Claimant as having a major depressive episode, but also diagnosed him for acute post-traumatic stress disorder. He referred Claimant for a psychiatric consult to Dr. Nathan at Allegheny General Hospital because he believed Claimant needed to be on medication. Dr. Coburn explained that post-traumatic stress disorder was a disorder that occurred when someone was exposed to an unusual event and severe stress that was not in the normal everyday realm of activity. He believed that based on what Claimant had conveyed to him that had occurred within the walls of SCI–Pittsburgh, Claimant had been through some unusual and disturbing experiences, most notably the incident involving the inmate (Hines) who slit his own throat and which Claimant in his mind believed was "the straw that broke the camel's back." (Reproduced Record at 174a.) Dr. Coburn noted that Claimant did not feel that he could perform the most menial of his job duties, including taking blood pressure, for fear that an inmate would attack him in some way, even though that was not what a nurse would expect to experience in a helping position with people. However, when Dr. Coburn was specifically asked whether Claimant was subjected to abnormal working conditions for a nurse in a prison, he responded: "I think certainly as somebody who's heard a lot of unhappy stories in my life, it was kind of horrifying to hear his descriptions of what had happened. *I cannot say whether that is an unusual experience for a prison nurse*, it is certainly an unusual experience for a human being. I think that he clearly had a psychiatric reaction to those events, which I think a lot of people would have had." (Reproduced Record at 151a.) (Emphasis added.) Dr. Coburn stated that he was treating Claimant approximately once a week, and Claimant had

made remarkable strides in his recovery, but he was not fully recovered. He noted that Claimant had returned to work as a nurse elsewhere and was still on medication.

Claimant also offered the testimony of his father, Theodore Babich (Babich), who worked at SCI–Pittsburgh for 16 years as a Corrections Officer 1 in all areas of the prison, including the restricted housing unit, and currently worked at the prison transporting prisoners to hospitals outside the prison for treatment. Babich stated that at times, his son had worked in the restricted housing units where the worst inmates were housed who could not function in the general population for reasons of their mental conditions. He explained that these inmates came to SCI–Pittsburgh sometime in 2000 from other institutions after all of the capital cases/death row cases in SCI–Pittsburgh had been moved to Greene County. He indicated that at the time Claimant worked at SCI–Pittsburgh, no correctional officer accompanied the nurses on their rounds when they went into the restricted housing unit, specifically not into the LTSU. However, after Claimant left his employment at SCI–Pittsburgh, changes were made and a correctional officer was now required to accompany a nurse when he or she dispensed medications or treatment to an inmate in the restricted housing units. Also, nurses did not wear anything except scrubs while correctional officers now wore black "ninja" type jumpsuits to protect themselves from anything inmates threw at them.

Finally, Claimant offered the testimony of Raymond Link, Jr. (Link), employed by SCI–Pittsburgh for 20 years, of which he worked 18 years as a Relief Officer. Link stated that he worked in the restricted housing unit on occasion over the years as a corrections officer dealing with the in-

mates in the LTSU whom he said were segregated from the other inmates because they could not get along with anybody. He testified that the inmates in the LTSU were more difficult to deal with than the other prisoners, and he had, what he thought, was urine thrown on him on one occasion. He also stated that there was documentation proving that other situations had occurred where inmates had thrown urine on corrections officers or nurses, and inmates had cut their own throats.

Testifying on behalf of Employer was Diane Manson (Manson), a Registered Nurse Supervisor at SCI–Pittsburgh for six-and-a-half years. Manson stated that prior to holding that position, she was employed as a Staff Nurse at SCI–Pittsburgh for three years where she also worked in the restricted housing area just as Claimant did. She also worked at Montefiore Hospital from 1983 through 1993 as a staff nurse in the bone marrow transplant unit, neurosurgery department and the outpatient department. She stated that she was Claimant's supervisor when he worked the 10:00 p.m. to 2:00 a.m. shift. Manson testified that there was not too much of a difference between working in a hospital setting and working in a prison setting because "a nurse is a nurse, and your responsibilities and duties are almost the same anywhere you work." (Reproduced Record at 339a.) However, she noted that in a general hospital setting there was no restricted housing unit with patients who had disciplinary problems. Regarding Claimant, Manson testified that his conduct towards inmates was unprofessional on several occasions, but she did not attribute it to the circumstances of their job. She stated that she had experienced equally if not worse encounters while working in SCI–Pittsburgh, including seeing an inmate beaten to death with weights, seeing inmates self-mutilating into walls until they literally broke their neck by splitting their skulls open, and seeing inmates cut their throats quite a few times.

Donald E. Skunda (Skunda), also a Registered Nurse Supervisor, was Claimant's supervisor on the 6:00 a.m. to 2:00 p.m. shift when he worked overtime. He testified for Employer stating that he worked in that capacity at SCI–Pittsburgh for seven years and before that worked as a staff nurse for two years. He also stated that he had previous outside nursing experience in hospitals. Regarding SCI–Pittsburgh, he explained that there were three different units in the restricted housing area: there was A–100, which housed administrative custody inmates who were there for the long term because they either requested it or because they had committed so many different crimes such as rape of inmates, they were stalkers and preyed upon other inmates, or they committed crimes inside of the prison system. A–200 housed disciplinary custody inmates and then there was A–300, the LTSU, which housed the disciplinary problem inmates from other institutions. Skunda stated that he was in charge of training new nurses who came to work at the prison, and training lasted six weeks. He explained that as far as his nursing duties went, there was nothing different in the prison as compared to what he did when he worked in the hospitals. While the prisoners' attitudes were different because they were locked up and they swore a lot, there was also swearing at a hospital or nursing home. He admitted that there were incidents of inmates throwing feces and urine, but they were few and far between. More common were inmates exposing themselves and swearing. Skunda stated that when he trained the newly hired nurses, he explained to them that they could expect to be cussed at, whistled

at, that inmates would expose themselves to them and masturbate, that inmates could be violent and throw urine and feces at them, they could spit at them, they could threaten the nurses' family, and they would do it a lot of the time just to see what the nurse's reaction was or as a form of entertainment. Skunda stated that he told the new hires that if they were a religious person or did not like swearing, it was not the place for them to work because it was not a place for the weak at heart.[2]

Determining that Claimant's testimony was credible to establish that he was, in fact, exposed to the "horrible" work conditions and incidents he described, the WCJ, nonetheless, denied Claimant's petition because he concluded that Claimant failed to meet his burden of proving that he was exposed to abnormal working conditions and that he suffered either a psychological or a physical injury.[3] In arriving at his decision, the WCJ relied on the testimony of Manson and Skunda who both stated that they worked as staff nurses at SCI–Pittsburgh in the restricted housing unit, the same position held by Claimant, and that they were exposed to the same type of behaviors. Also, Link testified that he had been struck by bodily fluid that had been thrown by an inmate. Further, the WCJ determined that Claimant would have had to deal with the same type of injuries that he described regarding inmates Jones and Hines if he had been working in a hospital. The WCJ also noted that there was no

medical evidence to support a physical injury.

Claimant appealed to the Board arguing that the WCJ erred by failing to find that he was exposed to abnormal working conditions; that the WCJ erred by failing to grant him benefits under the alternative theory of a physical/mental injury; and that the requirement that he prove abnormal working conditions was violative of his constitutional rights to equal protection and due process of law. Regarding the first argument, the Board determined that the WCJ did not err because he considered whether Claimant's working conditions were abnormal in the context of his position as a nurse in a prison facility. The WCJ found credible the testimony of Manson and Skunda that it was not uncommon for prisoners to act out against the nurses and correctional officers, and that the staff was warned when they interviewed for these positions about the working conditions. Further, these conditions were not uncommon or specific to Claimant. As to Claimant's allegation that the WCJ failed to grant him benefits for a physical/mental injury, the Board found that the WCJ properly rejected this claim because Claimant failed to produce any evidence of a physical injury. Finally, relying on this Court's decision in *Berninger v. Workers' Compensation Appeal Board (East Hempfield Township)*, 761 A.2d 218 (Pa.Cmwlth.2000), the Board determined that the WCJ properly concluded that

---

2. Employer also offered the expert medical testimony of Stuart S. Burstein, M.D. (Dr. Burstein), board certified in psychiatry, who testified that he examined Claimant on one occasion at Employer's request. Dr. Burstein stated that while Claimant told him he suffered from anxiety as a result of all of the incidents at SCI–Pittsburgh, he did not show any signs of anxiety during the exam. The WCJ made no finding whatsoever regarding Dr. Burstein's examination of Claimant.

3. At the final hearing before the WCJ, counsel for Claimant stated that he was also "alleging that this is also a physical/mental injury in that the contacts that the Claimant sustained such as being attacked with feces and urine is a physical assault which constitutes or caused the mental disability; so we are proceeding along those lines, also." (Reproduced Record at 490a.)

Claimant's constitutional rights to equal protection and due process of law were not violated when he was required to prove abnormal working conditions, and affirmed the WCJ's decision. This appeal followed.[4]

■ In a claim petition, the claimant bears the burden of proving all of the elements necessary to establish entitlement to benefits under the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2626. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 535 Pa. 135, 634 A.2d 592 (1993). When the claimant alleges a psychiatric injury, he must prove that he was exposed to abnormal working conditions and that his psychological problems are not a subjective reaction to normal working conditions. *Martin v. Ketchum*, 523 Pa. 509, 568 A.2d 159 (1990). "In classifying working conditions as normal or abnormal, we do not employ a bright line test or a generalized standard, but instead, consider the specific work environment of the claimant; for we recognize that what may be normal for a

police officer will not be normal for an office worker. Consequently, we deny compensation for injuries resulting from events that are expected in the relevant working environment, whether it is an office worker's change in job title or responsibility, or a police officer's involvement in life-threatening situations." *RAG (Cyprus) Emerald Resources*, 912 A.2d at 1288.

■ Claimant again contends that the WCJ erred in failing to find that he was exposed to abnormal working conditions, essentially based on the WCJ's conclusion that he was exposed to "horrid" conditions and his finding that Claimant was credible when he testified about the bizarre incidents that Claimant encountered while working at SCI–Pittsburgh.[5]

While we do not dispute that the WCJ found Claimant credible and that his work environment was unpleasant, it was a maximum security prison and Claimant was aware of this when he decided to work there. We, therefore, disagree with Claimant when he suggests that these

---

**4.** Our scope of review of the Board's decision is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Scheinmer v. Workers' Compensation Appeal Board* (U.S. Steel), 833 A.2d 276 (Pa.Cmwlth.2003). In abnormal working condition cases, the ultimate determination of whether the employee established abnormal working conditions is a question of law fully reviewable on appeal. *Davis v. Workers' Compensation Appeal Board (Swarthmore Borough)*, 561 Pa. 462 751 A.2d 168 (2000). We have acknowledged that "psychic injury cases are highly fact-sensitive and for actual working conditions to be considered abnormal, they must be considered in the context of specific employment." *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America)*, 542 Pa. 614, 624, 669 A.2d 338, 343 (1996). Such a fact-sensitive inquiry requires deference to the fact-finding functions of the WCJ and, accordingly, we limit

our review of those factual findings to determining whether they are supported by the evidence and overturn them only if they are arbitrary and capricious. *Id.* Thus, as discussed *infra*, we view the appellate review of this question as a two-step process of reviewing the factual findings and then the legal conclusion. *RAG (Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton)*, 590 Pa. 413, 912 A.2d 1278 (2007).

**5.** It will always be difficult for a person in a profession where dangerous conditions are normal to prove abnormal working conditions. *City of Pittsburgh v. Logan*, 570 Pa. 500, 810 A.2d 1185 (2002). Notably, this Court has held that people who work in correctional facilities subject themselves to the dangers that come with being around dangerous people. *Anderson v. Workers' Compensation Appeal Board (Washington Greene Alternative)*, 862 A.2d 678 (Pa.Cmwlth.2004).

events could not have been anticipated when dealing with any of the dangerous inmates that he encountered or the vile medical situations he described. As the WCJ determined by relying on the testimony of Skunda, Claimant was made aware of what he was getting into when he filled out his application and went for six weeks of training. Claimant even testified that he encountered the swearing and threats from almost day one of his employment. Although Claimant alleges that these events ate away at his psyche until he finally suffered a mental meltdown, both Manson and Skunda testified that all of the nurses were subject to the same treatment that Claimant had received, including having feces and urine thrown on them, being verbally and physically threatened, and witnessing horribly gruesome mutilations by inmates. Manson specifically testified that she would expect to see those types of medical emergencies in a hospital outside of the prison as well, and Skunda testified that he told potential employees that the job was not for the faint of heart.

Although Claimant now argues that the normal duties of a prison nurse were to work in an infirmary or in triage, Claimant testified that from the beginning of his employment he began working in the restricted housing unit, so his duties did not change. He further testified that sometimes when he was passing medications to prisoners through the feed slots, they would try to grab him and he would deal with it by joking about it with his buddies. (Reproduced Record at 33a.) Claimant also stated that there was an inmate who had *slit his wrists* that Claimant had to treat, and that did not bother him at all.

(Reproduced Record at 47a.) Claimant also mentioned without describing any disdain that he received a letter of commendation for performing CPR on an inmate (Hines) who had cut his jugular vein in half and who he had temporarily revived, but that the inmate had ultimately died. (Reproduced Record at 41a–42a.) Although Dr. Coburn stated that this incident was "the straw that broke the camel's back," Claimant made **no** mention of it causing him any psychological distress during his testimony before the WCJ. While Claimant claims that he was subject to criminally insane convicts who were housed at Mayview or Farview before coming to SCI–Pittsburgh and arrived at SCI–Pittsburgh after he started working there, there is absolutely no evidence of this in the record. What the record reflects is that the death row inmates at SCI–Pittsburgh left the institution in 2000 to go to Greene County, and other inmates who were the most difficult to handle from other institutions were brought to SCI–Pittsburgh. All in all, even though Claimant would like this Court to believe that what he experienced was abnormal working conditions, the WCJ concluded, and we agree, that there was substantial evidence from several other witnesses who testified that they experienced the same conditions that Claimant had while working at SCI–Pittsburgh.[6] Consequently, what he experienced was a subjective reaction to a normal working condition, and the WCJ properly denied his claim petition for a mental/mental injury.

■ Claimant also argues, as he did unsuccessfully before the Board, that he suffered a physical/mental injury for which he

---

**6.** Although Claimant argues that there were changes made at SCI–Pittsburgh after he left for the protection of the nurses and corrections officers, those changes have no bearing on whether there were abnormal working conditions, but only reflect the dangerous conditions of the environment. No one disputes that the prison is a dangerous environment.

should have been granted benefits because he suffered a physical battery.[7] Claimant relies on *Donovan v. Workmen's Compensation Appeal Board (Academy Medical Realty)*, 739 A.2d 1156 (Pa.Cmwlth.1999), stating that it is not necessary for Claimant to prove he suffered a physical injury that caused his mental disability, but only that he suffered a physical "stimulus" resulting in his mental disability. In *Donovan*, a janitor cleaning a dentist's office was stuck several times by improperly disposed of hypodermic needles and suffered a mental injury. The claimant received medical treatment for his physical injury in the way of blood work and booster shots. Finding that the Board erred in categorizing his injury as mental/mental instead of physical/mental, we held that a claimant did not need to prove that he suffered a physical disability that caused a mental disability for which he could receive benefits, but only needed to prove that a physical stimulus resulted in a mental disability. While a physical stimulus need not be disabling, even though it is unwelcome, it still needs to be more than a touching. For example, in *Cantarella v. Department of Corrections*, 835 A.2d 870 (Pa.Cmwlth.2003), we analyzed a food service instructor under the mental/mental standard when she was touched on the buttocks by an inmate, and held the physical contact did not rise to the level of an abnormal working condition. In this case, we do not have an "injury"—a needle stick—as in *Donovan*—but we have more of an unwelcome touch as in *Cantarella*, because it is not the touch that is objected to here, but what Claimant was touched with—feces and urine. However, it is not unusual for nurses in prisons (or, for that matter, in hospitals) to be touched or struck with urine, feces and all kinds of other bodily fluids; it is simply part of the job. Absent more, normal contact that is part of the "job" is not the physical "stimulus" required in order for the physical/mental standard to apply.

■ Even assuming that the physical/mental standard applied, Claimant did not make out his claim because he failed to establish that the feces and urine being thrown on him caused his mental injury. In concluding that Claimant did not suffer a physical/mental injury, the WCJ stated:

I have also considered the claimant's argument that it was a physical injury, the assault of being struck by the feces and urine, which resulted in his psychological problems. However, there is no medical evidence whatsoever to support such a claim. Even if the total testimony of Dr. Coburn was credited, it would establish that the claimant's psychological problems are due to the mental stresses he faced at work. Nowhere in his testimony does he attribute the psychological problems to any physical injury which he sustained at work. In fact, there was no evidence that the claimant actually suffered a physical *injury* as a result of the activities which occurred at work involving the inmates. Therefore, I find that this alternate argument, which was brought up late in the litigation, is also without merit.

(WCJ's April 20, 2004 decision at 4.) We agree with the WCJ that there is no evidence of record that being struck by urine and feces caused Claimant's psychological

---

**7.** A claimant alleging a mental injury from a physical stimulus need only demonstrate that the physical stimulus caused the injury. *Vactor v. Workmen's Compensation Appeal Board (Glenn's Dairy, Inc.)*, 699 A.2d 834 (Pa. Cmwlth.1997). Thus, "a claimant's burden in a physical-mental case is exactly the same as the burden generally utilized to determine workers' compensation eligibility: that the injury arose in the scope of employment and is related thereto." *Id.* at 837.

condition. To the contrary, Dr. Coburn's testimony established that the event that triggered his mental breakdown was when an inmate slit his own throat which Claimant believed was "the straw that broke the camel's back." (Reproduced Record at 174a.) Consequently, the WCJ properly denied Claimant's request for a physical/mental claim petition as well.[8]

Accordingly, the order of the Board is affirmed.

## ORDER

AND NOW, this 12th day of April, 2007, the order of the Workers' Compensation Appeal Board, dated June 30, 2006, at No. A04–1223, is affirmed.

## DISSENTING OPINION BY Judge McGINLEY.

I respectfully dissent to the majority's conclusion that Eli Babich (Claimant) is not entitled to workers' compensation benefits. I specifically dissent to the majority's determination that Claimant failed to establish that he was entitled to benefits for a physical/mental injury.

As the majority states, a claimant alleging a mental injury need only demonstrate that the physical stimulus resulted in a mental disability. A claimant suffering a physical/mental injury need only prove that the injury arose in the course of employment and was related thereto. *Donovan v. Workers' Compensation Appeal Board (Academy Medical Realty)*, 739 A.2d 1156, 1161 (Pa.Cmwlth.1999).

Here, Claimant credibly testified that feces and urine were thrown in his face.

Claimant was tested for hepatitis and AIDS. Because of confidentiality considerations, Claimant was not told whether his assailant had AIDS. The majority argues that this physical stimulus is not sufficient. The majority contrasts the present controversy with *Donovan* where Thomas Donovan (Donovan), a janitor was stuck with used hypodermic needles while cleaning an office. The majority argues that being struck in the face with urine and feces was not an injury, but was instead an unwelcome touching insufficient to serve as a physical stimulus for a mental disability.

I cannot agree. First, Claimant clearly was struck in the face with urine and fecal material. Much like Donovan, Claimant was contacted by something which conceivably led to him contracting a serious disease. Second, the majority states that "we do not have an 'injury.'" However, an injury is not what is required under the case law. Only a stimulus is required. Third, the majority asserts that because it is not unusual for nurses in prisons to be struck with urine, feces, and other bodily fluids and is just "part of the job," it does not serve as a physical stimulus required for the physical/mental standard to apply. This Court noted with disapproval similar reasoning by the WCJ and the Board in *Donovan:* "We find it to be astonishing, if not outrageous, the rather cavalier suggestion, inferred by the WCJ and the Board and advanced by Employer [Academy Medical Realty, Donovan's employer] that exposure to and wounding by improperly

---

**8.** Claimant also raises the same argument that his constitutional rights to equal protection and due process of law were violated when he was required to prove abnormal working conditions. As the Board properly advised Claimant, this issue was squarely addressed in *Berninger,* and we need not address it again in this decision.

disposed of hypodermic needles are simply part of the normal working conditions of janitors in medical offices." *Donovan,* 739 A.2d at 1163. Similarly, here, I cannot accept that it is simply part of the job of a prison nurse to have bodily fluids thrown in his unprotected face. Fourth, I believe this situation is much more akin to the situation in *Donovan* than in *Cantarella v. Department of Corrections,* 835 A.2d 870 (Pa.Cmwlth.2003), which the majority mentions, where an inmate touched the buttocks of a food service instructor in a prison.

The majority also asserts that even if the physical/mental standard applied, Claimant did not make out his claim because he failed to establish that the feces and urine being thrown on him caused his mental injury. The majority cites the WCJ's determination that Claimant's witness, Dr. Coburn, did not attribute Claimant's psychological problems to a physical injury which he received at work.

A review of Dr. Coburn's testimony leads to a contrary conclusion. Dr. Coburn testified that Claimant informed him of a number of situations where "some bizarre things had happened to him in the prison setting." Deposition of P. Christopher Coburn, Ph.D., May 6, 2002, (Dr. Coburn Deposition) at 7; Reproduced Record (R.R.) at 143a. Among these "bizarre things" was having feces thrown in his face. Dr. Coburn Deposition at 7–8; R.R. at 143a–144a. Dr. Coburn diagnosed Claimant with post traumatic stress disorder. Dr. Coburn Deposition at 10; R.R. at 146a. Dr. Coburn stated that Claimant experienced a series of unusual events which a nurse would normally not experience. Dr. Coburn Deposition at 13–14; R.R. at 149a–150a. These unusual events include the event at issue here. Dr. Coburn essentially attributed the cause of Claimant's post traumatic stress disorder

to these events. Dr. Coburn Deposition at 24–26; R.R. at 160a–162a. Although Dr. Coburn did testify on cross-examination that the incident where an inmate slit his own throat was the "straw that broke the camel's back," Dr. Coburn Deposition at 37–38; R.R. at 173a–174a, as the majority states, Dr. Coburn did not testify that that was the only event which led to his mental injury.

I believe that Claimant met his burden of proof that he suffered a physical/mental injury. I would reverse the denial of benefits and remand for necessary credibility determinations and factfinding.

Judge SMITH–RIBNER joins in this dissent.

DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. The majority holds that Eli Babich (Claimant) failed to establish that he suffered a psychic injury as a result of abnormal working conditions while working as a registered nurse at the State Correctional Institution at Pittsburgh (SCI–Pittsburgh). For the following reasons, I cannot agree.

### I. Case Law

Psychic injury cases are highly fact-sensitive. *City of Pittsburgh v. Logan,* 570 Pa. 500, 810 A.2d 1185 (2002). Thus, in classifying working conditions as normal or abnormal, courts consider the claimant's specific work environment. *RAG (Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton),* 590 Pa. 413, 912 A.2d 1278 (2007). Courts will deny compensation to a claimant for injuries resulting from events that are expected in the relevant work environment. *Id.*

In *Logan,* our supreme court had to decide whether a police officer was sub-

jected to abnormal working conditions when someone placed a $50,000 bounty on his life. The court stated that some threats are normal, but that does not mean, as a matter of law, that all types and manners of threats may be anticipated in the course of an officer's duties. *Logan.* One witness testified that it was the **first time** that he heard of anyone placing a $50,000 bounty on a police officer's life. Thus, the court concluded that such a threat was abnormal, i.e., could not have been anticipated in the performance of the officer's duties. *Id.*

Although the abnormal threat in *Logan* was a "first," in *Kennelty v. Workers' Compensation Appeal Board (Schwan's Home Service, Inc.),* 899 A.2d 1204 (Pa. Cmwlth.2006), this court held that, although a food delivery person had been involved in five or six robbery incidents, a holdup at gunpoint constitutes an abnormal working condition for a food delivery person. In other words, the fact that the food delivery person had been a robbery victim multiple times in the past did not mean that he could expect a robbery in the normal performance of his duties.[1]

An abnormal incident need not be a "first," but, to be considered unexpected in the normal performance of one's job duties, the incident must be unusual. Thus, in *RAG,* our supreme court stated:

> [Our case law] demonstrates the need for courts to look at the totality of the circumstances. As we can envision a single incident that could constitute an abnormal working condition, if sufficiently severe and **unusual** in the context of the relevant working environment, so too can we envision that relatively minor conduct could result in a determination of abnormal

working conditions if that conduct is imposed repeatedly and is demonstrably **unusual** in that environment.

*RAG,* 590 Pa. at 430–31, n. 10, 912 A.2d at 1289 n. 10 (emphasis added).

## II. Abnormal Incidents

Based on the above rule of law governing abnormal incidents, I would conclude from the evidence presented in this case that Claimant was subjected to the following two abnormal incidents while working as a nurse at SCI–Pittsburgh.

### A. Self–Mutilation

Here, Claimant treated various types of injuries from 1999 to 2001, many of which he could have expected. However, Claimant credibly testified as follows regarding the "worst incident" he ever had seen:

> [Inmate Chad Jones had] blood all over his trunks, blood all over his face. I went, whoa, what happened. So I pick up his drawers and he had [a] testicle hanging down to his knee. . . .

> So immediately you had to grab his testicle and put it in place. . . . I sent him out to the hospital. The hospital called up and said, "We've got a problem. . . . We're missing a testicle." They found strands of testicle in his teeth.

> So I got permission . . . to go into his cell with a little cup . . . with a piece of cardboard. . . . It looked like Swedish meatballs. Scraped them up off the ground and put them in the cup and brought [them] back in a cup.

(R.R. at 48a–49a.) Claimant's supervisor, Diane Manson, conceded as a witness for Claimant's employer that this incident was

---

1. This court explained that we are "unprepared to accept that our society has deteriorated to the point where a holdup at gunpoint does not constitute an 'abnormal working condition' for a food delivery person." *Kennelty,* 899 A.2d at 1208.

abnormal.[2] (R.R. at 363a.) Ted Babich, Claimant's father and a prison guard at SCI–Pittsburgh for sixteen years, testified that he knows of no other time when an inmate cut off his testicles. (R.R. at 451a.)

Given the admission of Claimant's supervisor and the testimony that no other inmate had mutilated himself in this manner over a sixteen year period, I would conclude that this type of self-mutilation was unusual. Indeed, there is no evidence in the record suggesting that Claimant could have anticipated that, in the performance of his normal duties, he would be required to treat an inmate's mutilated testicle or to scrape the remains of an inmate's testicle from the floor of a prison cell. Certainly, under Logan, the incident must be considered abnormal.[3]

### B. Slit Throat

Claimant also credibly testified about his treatment of inmate Albert Hines, who attempted to commit suicide by slashing his throat.

He took a razor blade and cut from here to here. He cut his jugular, cut it right in half. They brought him over to triage. Basically, I had to do CPR. . . . He was dead, clinically dead, wasn't even breathing. I brought him back doing CPR, suctioning his mouth.

(R.R. at 62a.) As to whether a prison nurse could expect to give CPR under such circumstances, Manson, who had worked at SCI–Pittsburgh for nine and a half years, testified:

Q And have you ever had to give CPR to an inmate that slashed their throat?

A As a matter of fact, yes, I have.

Q When was that?

A I can't recall the year to date at this time, but yes, I have.

Q How long ago?

A Oh, I would say it was a couple of years, maybe three years, three years ago.

Q You [would] consider that to be an abnormal event, **even in your prison** then, wouldn't you?

A Abnormal, yes, we don't—yes.

(R.R. at 362a–63a) (emphasis added). No other prison nurse testified that he or she ever was required to perform CPR on an inmate who slashed his throat. Because Manson only gave CPR to an inmate who slashed his throat once in nine and a half years, I submit that the incident was unusual for the work environment of a nurse at SCI–Pittsburgh. Thus, I would conclude that Claimant could not have anticipated the incident in the performance of his normal duties and that the incident constitutes an abnormal working condition.[4]

---

2. Manson testified that she had seen worse medical situations. However, such testimony is irrelevant to whether Claimant could have anticipated this particular medical situation.

3. The WCJ found that Claimant credibly testified that he was exposed to the incidents he described but that Claimant was not the only employee in his position to be so exposed. However, as indicated, there is **no** evidence that any other prison nurse ever was required to treat an inmate who mutilated his testicles and then scrape the remains of a testicle from the floor of the prison cell.

4. Claimant's medical expert, P. Christopher Coburn, Ph.D., testified that this incident was the "straw that broke the camel's back." (R.R. at 174a.) I note that, in Logan, where an abnormal threat was made to a police officer, our supreme court stated, "While . . . [the abnormal threat] predated [the officer's] collapse, [the abnormal threat] undoubtedly set the stage for [the officer's collapse] when the cumulative assaults [i.e., normal working conditions,] occurred, and [the abnormal threat] enhanced their effect." Logan, 570 Pa. at 509–10, 810 A.2d at 1190. Thus, to prove that an abnormal working condition caused a psychic injury, a claimant need not

### C. Other Work Environments Irrelevant

The WCJ found that nurses in medical facilities outside the prison context could be exposed to the above medical situations, stating:

> Also, I do not believe that the medical situations to which the claimant was exposed are abnormal for anyone working as a registered nurse. Even in the outside population, people mutilate their own bodies, and attempt to commit suicide. Once they have done so, they are taken to medical facilities, and medical professionals have to deal with them. Not pleasant, but not abnormal for that profession either.

(WCJ's op. at 2.) However, the WCJ's legal reasoning is flawed. The fact that a medical situation **could** occur at a medical facility does **not** make that medical situation a common situation at the medical facility. The types of medical situations that **could** require treatment at a medical facility are limited only by the human imagination. If a nurse claiming a psychic injury must prove that no one ever imagined a particular medical situation in order to demonstrate an abnormal working condition, then it would be impossible for a nurse to establish a compensable psychic injury. Even horrific rare diseases, including those unknown to modern medicine, would not qualify as abnormal because they **could** occur at a medical facility.

Moreover, in my view, the medical situations that nurses face outside the prison context are irrelevant. Although the majority would disagree, (see majority op. at 12), I submit that the WCJ erred in considering evidence relating to medical facilities outside the context of SCI–Pittsburgh.

---

prove that the abnormal working condition precipitated the injury, i.e., that it was the "straw that broke the camel's back"; the

---

The law is clear that, in determining whether an incident constitutes an abnormal working condition, courts examine only the claimant's specific work environment. *RAG.*

Assuming that such evidence was relevant, the WCJ made no finding as to whether mutilated testicles and slit throats were common or uncommon in medical facilities outside the prison context. **Every** medical professional who testified against Claimant, and who was asked the question, testified that these medical situations were abnormal. As indicated above, Manson testified that the mutilated testicle and slashed throat incidents were abnormal. Donald Skunda, another nurse supervisor, testified that they were abnormal. (R.R. at 404a.) Stuart S. Burstein, M.D., testified that if one of these events occurred during the workday of a nurse at a hospital, it would be abnormal. (R.R. at 311a.)

### III. Expectations from Training

The majority states that Claimant could have anticipated the medical situations he faced at SCI–Pittsburgh because Claimant received six weeks of training after he was hired in 1999. (Majority op. at 11–12.) I disagree.

The training that Claimant received in 1999 could not have prepared Claimant for the mutilated testicle and slashed throat incidents. Skunda, who provided the training, testified as follows:

> Well, we tell them that in the RHU … you can be expected to be cussed at, whistled. You can expect to … have inmates expose themselves to you…. [T]hey can throw urine and feces at you. They'll even threaten you at times,

---

claimant need only prove that an abnormal working condition exists in the chain of causation.

threaten your family. A lot of times they do it just to see what your reactions are. That's their ... entertainment.

(R.R. at 395a.) In his training program, Skunda did not even mention the types of medical situations that a nurse might face in prison.

Moreover, Claimant asserts that he began working at SCI–Pittsburgh before the criminally insane were moved to SCI–Pittsburgh in 2000. The majority states that there is "no evidence of this in the record." (Majority op. at 64.) I agree that there is no evidence establishing that the inmates moved to SCI–Pittsburgh in 2000 were "criminally insane"; however, there is evidence that the inmates were mentally disturbed and that their behavior was unpredictable.

Ted Babich testified that, in 2000, the Commonwealth moved prisoners with mental conditions, the "mentally disturbed," from various state prisons to the Long–Term Segregation Unit (LTSU) at SCI–Pittsburgh. (R.R. at 448a–49a.) The witness further testified that these prisoners are "totally unpredictable," calling them "nuts" and stating that "you don't know what they're going to do." (R.R. at 452a, 470a–71a.) In his training program, Skunda did not mention a possible influx of unpredictable and mentally disturbed inmates. Thus, the six-weeks of training did not prepare Claimant for that possibility.

## IV. Expectations of a Maximum Security Prison

The majority states that Claimant could have anticipated the horrible working conditions he faced at SCI–Pittsburgh because Claimant was aware that SCI–Pittsburgh was a maximum security prison. (Majority op. at 63–64.) However, such reasoning assumes that **all** maximum security prisons provide the same working con-

ditions. This is not supported by the record.

Ted Babich testified that a lieutenant and a deputy from SCI–Pittsburgh went to Colorado to inspect the prisons in Colorado. As a result, after Claimant left SCI–Pittsburgh, prison officials made changes in the cells that now make it impossible for inmates to throw feces and urine out the side of the doors. (R.R. at 460a–61a.) Thus, SCI–Pittsburgh is now a maximum security prison where inmates cannot throw feces and urine on the nurses. This means that no one would expect inmates to throw feces and urine at prison nurses, and, if it occurred, it now would be abnormal.

In addition, when Claimant worked at SCI–Pittsburgh, it was a maximum security prison that required nurses to sometimes make their rounds by themselves. Once Claimant left, SCI–Pittsburgh required that nurses be accompanied by guards at all times. (R.R. at 457a.) Thus, SCI–Pittsburgh is now a maximum security prison where prison nurses are not required to make their rounds by themselves. This means that no one would expect prison nurses to make rounds unprotected by guards, and, if it occurred, it now would be abnormal.

Finally, when Claimant worked at SCI–Pittsburgh, inmates could grab nurses through the feed slots while the nurses were dispensing medications. (R.R. at 33a.) Once Claimant left, SCI–Pittsburgh required that inmates move to the back of the cell while nurses dispensed medications. (R.R. at 458a.) Thus, SCI–Pittsburgh is now a maximum security prison where inmates cannot grab nurses while they dispense medications. This means that no one would expect inmates to grab nurses through the feed slots, and, if it occurred, it now would be abnormal.

In sum, Claimant could not have expected the above working conditions based on the mere fact that he knew SCI–Pittsburgh was a maximum security prison. As indicated, all maximum security prisons are **not** the same.

Accordingly, unlike the majority, I would reverse.

Judges McGINLEY and SMITH–RIBNER join in this dissent.