**PA LIQUOR CONTROL BOARD, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (KOCHANOWICZ), Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 11, 2011.
Decided Sept. 20, 2011.

Robert J. Baker, Harrisburg, for petitioner.

Alfred J. Carlson, III, Philadelphia, for respondent Gregory Kochanowicz.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

## OPINION BY Judge PELLEGRINI.

The Pennsylvania Liquor Control Board (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) granting the Claim Petition of Gregory Kochanowicz (Claimant) for a work-related psychic injury. Because Claimant's psychic injury[1] was the result of normal working conditions, we reverse.

The facts of this case are not in dispute. Claimant worked for Employer for over 30 years and was last employed as the general manager of Employer's retail liquor store located in Morrisville, Pennsylvania. Claimant was working the evening shift on April 28, 2008, when the store was robbed by a masked man brandishing two guns. During the robbery, the perpetrator pointed both guns at Claimant and prodded the back of Claimant's head with a gun. The perpetrator stole money from the office and a cash register, tied Claimant and his co-worker to chairs with duct tape and then fled the store. Neither Claimant nor his co-worker was physically injured during the robbery. However, after the incident Claimant suffered anxiety, depression, and flashbacks, and could not return to work. He began seeing a clinical psychologist who diagnosed him with post-traumatic stress disorder (PTSD). Claimant then filed a Claim Petition seeking total disability benefits effective April 29, 2008, alleging that he sustained PTSD as a result of being robbed at gun point while in the course and scope of his employment. Employer filed an Answer and a Notice of Compensation Denial indicating that Claimant had not sustained a compensable work-related injury.[2]

1. The term "psychic" comes from the psychoanalytic term "psyche" which refers to forces that influence an individual's thought, behavior and personality.

Before the WCJ, Claimant testified that he had worked as a manager for Employer for 20 years and that as of April 2008, he had been the manager of the Morrisville retail store for two years. On April 28, 2008, he was working the night shift with one other part-time female employee. At approximately 8:57 p.m., Claimant was in his office preparing to close the store for the evening when his coworker called his name. Claimant stood up and saw a masked man approaching him with a gun drawn. Claimant immediately told the perpetrator "to take whatever he needed to and just not to hurt anybody." (Reproduced Record (R.R.) at 33a.) The perpetrator told the female employee to lock the front door and make sure no one was outside. According to Claimant, the perpetrator then entered the office, reached inside his pocket, and drew a second gun. The perpetrator then threw a backpack on the floor, instructed Claimant to open the safe and put all of the money in the backpack. The perpetrator then instructed Claimant to open a lock box, which was empty. Claimant testified that throughout these events the perpetrator had a gun directed to the back of Claimant's head. The perpetrator then instructed the female employee to open her register with the open key used for emergencies, bring the money into the office, put it into the backpack, and that she should not hit any alarms. The perpetrator then had Claimant and his co-worker sit in chairs and he tied them up with duct tape. Claimant testified that the perpetrator had a gun to the back of his head and that Claimant sighed or expressed some sort of anxiety. The perpetrator

then prodded him with the weapon and asked if he was impatient or annoyed. Again, Claimant told him to take what he needed and not to hurt anyone. Finally, the perpetrator told Claimant and his co-worker that he was going to leave and that they must wait 20 minutes before calling anyone or going out the back door because he might come back inside. Claimant testified that he waited approximately five minutes before he freed himself from the duct tape and called the police. Claimant also reported the incident to Employer's main auditor and his district manager.

Claimant testified that Employer referred him to the State Employee Assistance Program (SEAP), which put him in contact with a social worker. Claimant had three visits with this social worker. Employer did not refer Claimant to a psychiatrist or psychologist. Claimant's counsel then put him in touch with Brian S. Raditz, Ed.D., (Dr. Raditz) a psychologist whom he has treated with once a week since the incident. Claimant testified that he had never been the victim of a robbery before and that prior to the robbery he had never been in psychiatric or psychological treatment. Claimant testified that he thought about the robbery every day, and that it disrupted his sleep, caused nightmares, anxiety, stress, and difficulty relating with his family. Claimant also took the prescription drug Xanax for his anxiety, as needed. According to Claimant, his sessions with Dr. Raditz have been helpful and he had seen some progress. However, he did not feel that he had improved to the point that he could return to his previous position with Employer because he was in fear for his life and he

---

2. Claimant also filed a Penalty Petition alleging Employer violated the Workers' Compensation Act by failing to timely file notification accepting or denying the claim. The WCJ denied the Penalty Petition and neither party appealed; therefore, the Penalty Petition is not at issue.

feared that something like that would happen to him again. Claimant also stated that he has not been able to engage in his part-time job as a realtor since the robbery.

On cross-examination, Claimant admitted that the store was not in a "low risk" area, had a high volume of shoplifting and had customers on almost a daily basis who he considered to be safety risks. (R.R. at 44a–45a). Regarding these types of incidents, Claimant stated that he knew of the procedures Employer had in place for dealing with emergencies such as a robbery, that he had been trained on these procedures, and that he adhered to them during this incident. Specifically, Claimant received work place violence training in 1999, 2000 and 2005. During this training, Claimant received a manual entitled "Building a Safe Work Place, Preventing Work Place Violence" (R.R. at 52a) and a booklet entitled "Things You Need to Know About Armed Robbery." (R.R. at 54a). He also received and signed a management directive in April 2005 which stated that violence in the work place might take many forms, including robbery and attempted robbery. Claimant admitted that during his monthly meeting with the district manager, they reviewed what to do in case of an emergency, including a robbery. He also admitted that he received a notification by e-mail that Employer's retail store in Penndel had been robbed and that he read this email prior to this incident. Claimant stated that the cash registers at Employer's stores had a special open key for use during emergencies in order to provide quick access and protect employees' safety.

Claimant also presented the deposition testimony of Dr. Raditz, a certified clinical psychologist who first saw Claimant on May 6, 2008. Claimant relayed the circumstances of the robbery during which time Dr. Raditz noted that his affect was flat, he was somewhat fearful, but he elicited no gross signs of psychopathology. Claimant told Dr. Raditz that he was having flashbacks of the robbery, was anxious, depressed, had trouble sleeping, and was angry and withdrawn over his victimization. Dr. Raditz diagnosed Claimant with PTSD and stated that Claimant's condition was work-related. According to Dr. Raditz, Claimant was not capable of returning to his pre-injury position with Employer.

Employer presented the deposition testimony of Timothy J. Michals, M.D. (Dr. Michals), a licensed physician certified in clinical and forensic psychiatry. Dr. Michals was hired to conduct an independent psychiatric evaluation of Claimant concerning his work-related injury. During the evaluation on August 20, 2008, Claimant related the facts surrounding the incident and stated that when he thought about the robbery, it got him going, his insides started shaking and he started to breathe quickly. Claimant described his symptoms as trouble sleeping, periodic nightmares, decreased energy, and irritability. While Claimant told Dr. Michals that he believed the treatment was helping and he felt he was getting better, he did not think he would be able to return to his previous job because of the emotional symptoms he was experiencing. Claimant indicated that he hoped to obtain some other type of employment position with Employer. Claimant told Dr. Michals that he received a notification prior to this incident that a robbery had occurred in another liquor store in Bucks County. He also told Dr. Michals that in 1981 his brother was stabbed to death during a robbery. Claimant was very close to his brother but did not receive psychological treatment at that time.

Dr. Michals testified that based upon his evaluation and a review of Claimant's rec-

ords, it was his opinion, with a reasonable degree of psychiatric certainty, that Claimant had experienced, by history, PTSD as a direct result of the April 28, 2008 work injury. Dr. Michals indicated that at the time of the evaluation, he felt Claimant had shown improvement, he gained from his treatment, and while he had some anxiety left, it had faded and no longer rose to the level of a mental disorder. His opinion was that Claimant was not disabled on a psychiatric basis and that he was capable of returning to work in his pre-injury position.

Employer also presented the deposition testimony of Charles Keller (Mr. Keller), its training specialist and SEAP coordinator for the southeastern region of the Commonwealth. Mr. Keller testified that Employer established its work place violence training program in the late 1980s due to employees being subjected to robberies, thefts and fights in Employer's retail stores. The goal of the training was to make employees aware of what could happen and to explain to them what to do in case of an emergency. Mr. Keller stated that Employer gave its managers and employees several booklets as part of this training, including one entitled "Things You Need to Know About Armed Robbery" which outlined how they should act in the specific event of a robbery. Mr. Keller testified that he personally trained Claimant on this subject on September 21, 2001, and April 8, 2005. During this training, Mr. Keller instructed employees to be as calm as possible, do what the suspect said, get the suspect out of the store as fast as possible, lock the doors after he left, and then call the police, the district manager and the audit department. Mr. Keller testified that Claimant followed this

training step by step when the store was robbed; he did everything right. According to Mr. Keller, Claimant also received training on a monthly basis from his district manager regarding what was going on in other stores as well as a refresher on workplace violence and thefts. He testified that robberies and fights happened in Employer's stores and all managers and employees were at risk; that is why Employer provided the training. Specifically, Mr. Keller testified that since 2002, Employer's retail stores located in Bucks, Montgomery, Chester, Delaware, and Philadelphia Counties had suffered a total of 99 armed robberies.[3]

■ The WCJ granted Claimant's claim petition finding that Claimant met his burden of proof that he was subjected to abnormal working conditions and that the workplace violence he experienced caused his psychic injury. The WCJ found Claimant's testimony to be credible, persuasive, and consistent with the medical evidence, and she accepted the expert medical opinion of Dr. Raditz as competent and credible. The WCJ stated that she "accepts the [Employer] to the extent to which it is consistent with her findings in this case. To the extent to which [Employer]'s evidence is not consistent with Claimant's testimony, [Employer]'s evidence is rejected." (WCJ Opinion at 8). The WCJ found that armed robbery was an abnormal working condition, despite the incidents of robberies at Employer's other retail stores and despite the evidence that Claimant attended training on workplace violence, including how to handle a robbery. Notably, the WCJ stated:

This Judge finds the evidence relative to the training of employees in ways of behaving during a robbery that best en-

---

3. Employer also submitted into evidence the deposition testimony of John R. Ross, a private investigator hired to conduct surveillance of Claimant. However, Mr. Ross' testimony does not go to the main issue in this case.

sures *safety* to the person to whom the gun is pointed, as well as fellow employees and customers competent, she does not find that it [sic] entirely relevant to defend the type of injury that Claimant sustained on April 28, 2008. The fact that Defendant provides immediate debriefing to its employees and refers employees to its SEAP program following a violent workplace event correlates more closely with Claimant's case-in-chief. (WCJ Opinion at 8). Employer appealed to the Board which affirmed, and this appeal followed.[4]

■ On appeal, Employer argues that the WCJ erred in granting Claimant's Claim Petition because Employer presented uncontroverted evidence, in the form of statistics as well as the training it provides its employees, that the armed robbery Claimant experienced was "normal" for his specific industry.

■ When pursuing a workers' compensation claim petition, the claimant bears the burden of proving all of the elements required to establish that he or she is entitled to benefits under the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708. *Babich v. Workers' Compensation Appeal Board (CPA Dept. of Corrections),* 922 A.2d 57, 63 (Pa. Cmwlth.2007). When the claimant alleges a psychic injury, "he must prove that he was exposed to abnormal working conditions and that his psychological problems are not a subjective reaction to normal working conditions." *Id.* (citing *Martin v. Ketchum,* 523 Pa. 509, 568 A.2d 159

(1990)). Psychic injury cases are highly fact-sensitive and the working conditions must be considered in the context of the specific employment. *Pa. Department of Corrections v. Workers' Compensation Appeal Board (Cantarella),* 835 A.2d 860, 862 (Pa.Cmwlth.2003).

While there is no bright-line test or a generalized standard, we consider whether the working conditions were foreseeable or could have been anticipated. *Id.* (citing *City of Philadelphia v. Civil Service Commission of the City of Philadelphia,* 565 Pa. 265, 772 A.2d 962 (2001)). This Court has repeatedly held that if the employer provided training to its employees on how to handle a specific working condition, that working condition could have been anticipated. *See McLaurin v. Workers' Compensation Appeal Board (SEPTA),* 980 A.2d 186, 191 (Pa.Cmwlth.2009) (holding that a SEPTA bus driver could have anticipated being threatened with a gun because such incidents occurred with enough regularity that his employer included the handling of these situations in its drivers' training program); *Babich,* 922 A.2d at 64 (holding that a prison nurse could have anticipated strange and disturbing medical situations based upon his six weeks of training and the fact that these situations occurred with some regularity); *Cantarella,* 835 A.2d at 862–63 (holding that a state prison food service instructor could have anticipated assaults by inmates because all prison employees underwent training to be able to defend themselves).

In this case, the WCJ found that Employer provided Claimant with training on workplace violence—some of which was

---

4. Our review of the Board's decision is limited to determining whether an error of law was committed, constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence. *Babich v. Workers' Compensation Appeal Board,* 922 A.2d 57, 63 n. 4 (Pa.Cmwlth.2007). In psychic injury cases, the ultimate determination of whether the claimant established abnormal working conditions is a question of law fully reviewable on appeal. *Id.,* (citing *Davis v. Workers' Compensation Appeal Board,* 561 Pa. 462, 751 A.2d 168 (2000)).

specifically geared toward robberies and thefts—as well as "pamphlets and educational tools on the handling of a robbery." (WCJ Findings of Fact, No. 13.) Claimant admitted that he attended these trainings and received the educational booklets. Given these findings and this Court's prior decisions outlined above, Claimant could have anticipated being robbed at gunpoint. Moreover, when determining whether a working condition is abnormal, we consider the frequency of its occurrence in the specific industry. *Kennelty v. Workers' Compensation Appeal Board (Schwan's Home Service, Inc.)*, 594 Pa. 12, 13, 934 A.2d 692, 692 (2007); *see also McLaurin*, 980 A.2d at 191. Employer presented uncontested evidence that there had been 99 robberies of its southeastern Pennsylvania retail stores since 2002, which equates to 15 robberies per year or more than one per month. There had been four retail liquor store robberies in close proximity to Claimant's store within just weeks of the robbery in this case. Unfortunately, given the frequency Employer's stores had been robbed and the proximity of the recent incidents, robberies of liquor stores are a normal condition of retail liquor store employment in today's society, and the Board erred in holding otherwise.

Accordingly, the order of the Board is reversed.

## ORDER

AND NOW, this 20th day of September, 2011, the March 29, 2010 order of the Workers' Compensation Appeal Board at No. A09–1266 is reversed.

### DISSENTING OPINION BY Judge COHN JUBELIRER.

Because the Workers' Compensation Judge (WCJ) found that Claimant suffered a psychic workplace injury in the nature of Post Traumatic Stress Disorder (PTSD), the occurrence and causation of which are incontrovertibly attributable to a specific abnormal workplace event (Event),[1] I would conclude that this workplace injury is compensable under the Pennsylvania Workers' Compensation Act (Act).[2] Because I would affirm the Workers' Compensation Appeal Board (Board), I respectfully dissent.

As our Supreme Court has concluded, a claimant is entitled to workers' compensation (WC) benefits for a psychic injury if he can prove by objective evidence that he has suffered such an injury and that the injury is more than a subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 519, 568 A.2d 159, 164–65 (1990). In the instant case, the WCJ credited the testimony of Claimant, his medical witness, Dr. Raditz, and Employer's medical witness, Dr. Michals, all of which established that Claimant suffered PTSD and attributed that injury to the work-related Event. (WCJ Decision, Findings of Fact (FOF) ¶¶ 10, 11, 12.) Thus, *both* Employer and Claimant have established through the credited testimony of their witnesses that Claimant suffered work-related PTSD and that the work-

1. The Event took place on April 28, 2008 at the Bucks County retail liquor store Claimant managed. The Event consisted of an armed robbery during which a masked gunman directed Claimant's movements and actions; tied Claimant up; bound him to a chair in a back room, whereupon Claimant lost his freedom of movement; kept a gun pointed at Claimant; and, while expressing impatience and frustration with Claimant, prodded the gun against Claimant's head. (WCJ Decision, Finding of Fact ¶ 2.)

2. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2708.

place Event indisputably caused this injury.

In *RAG (Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton)*, 590 Pa. 413, 912 A.2d 1278 (2007), our Supreme Court set forth the following two-prong analysis for its review in cases involving a WCJ's grant of WC benefits for a psychic injury: (1) "whether the Commonwealth Court abused its discretion by substituting its factual findings for those made by the WCJ and supported by the record"; and (2) "whether the findings of fact support the legal conclusion that Claimant's injury was the result of an abnormal working condition." *RAG (Cyprus)* 590 Pa. at 426, 912 A.2d at 1286.[3] Determining whether a particular workplace scenario causing injury to a claimant is "normal" or "abnormal" is a highly fact-sensitive inquiry, requiring "deference to the factual findings of the WCJ," who had the benefit of observing the witnesses. *Id.* at 425, 912 A.2d at 1286.

I respectfully believe that the majority opinion would not pass this two-prong analysis in the instant case. The majority opinion reverses the grant of WC benefits here, without first addressing whether the WCJ's factual findings are supported by the record, and prematurely reaches its own, different conclusion that the Event was a normal working condition and, therefore, not compensable. This approach is problematic for two reasons. First, the majority opinion does not limit its review to the WCJ's factual findings and whether those factual findings are supported in the record, but instead relies upon uncredited evidence to essentially make its own factual findings that support its conclusion. Second, the majority opinion overemphasizes the role of the "foreseeability" in determining whether a workplace event is normal or abnormal, without performing the required, highly fact-specific inquiry into the Event.

I will address each of these concerns in turn, but preliminarily note that this Court's scope of review is limited to whether there is substantial evidence to support the WCJ's findings of fact. *Bethenergy Mines, Inc. v. Workmen's Compen-*

3. In *RAG (Cyprus)*, a case involving an aggravation of a mineworker's *pre-existing* PTSD caused by a supervisor's sexually harassing comments, the WCJ made findings that such comments were not normal occurrences in the mines although a *"lesser level* of jovial antics was common." *RAG (Cyprus)*, 590 Pa. at 421, 912 A.2d at 1283. Based upon the findings of fact, the WCJ concluded that the supervisor's comments constituted abnormal working conditions, emphasizing the calculated nature and intensity of the comments from the normal joking or uncivil behavior that often took place in the mines. *Id.* at 421–422, 912 A.2d at 1283–1284. The Board affirmed the WCJ, noting that several co-workers had testified that the comments went beyond those accepted in the mines and agreed, "[b]ased on the WCJ's findings of fact ... the claimant had established the existence of abnormal working conditions." *Id.* at 422, 912 A.2d at 1284. However, this Court reversed because it determined that the "evidence fail[ed] to support a finding of abnormal working conditions." *Id.* On appeal, the claimant asserted that this Court had usurped the function of the fact-finder by reweighing the evidence. In its review, the Supreme Court applied the two-prong examination set out above. With regard to the first prong, the Supreme Court concluded that this Court abused its discretion by not limiting its review to whether the WCJ's factual findings were supported by the record, noting three instances in which this Court essentially made its own interpretations of the record, and by focusing on a section of testimony not included in the WCJ's factual findings to support this Court's own conclusion. *Id.* at 426–427, 912 A.2d at 1286–1287. On the second prong, the Supreme Court reviewed whether the facts as found by the WCJ established the claimant's right to compensation pursuant to *Martin*, and held that they did. *Id.* at 429, 912 A.2d at 1288.

*sation Appeal Board (Skirpan)*, 531 Pa. 287, 291, 612 A.2d 434, 436 (1992). Substantial evidence is that relevant evidence a reasonable person "might accept as adequate to support a finding." *York Terrace/Beverly Enterprises v. Workmen's Compensation Appeal Board (Lucas)*, 140 Pa.Cmwlth.75, 591 A.2d 762, 764 n.5 (1991). Additionally, we should take all inferences drawn from the evidence in favor of the party prevailing before the WCJ. *Krumins Roofing and Siding v. Workmen's Compensation Appeal Board (Libby and State Workmen's Insurance Fund)*, 133 Pa. Cmwlth.211, 575 A.2d 656, 659 (1990). Finally, the WCJ is the ultimate determiner of credibility. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703, 706 (Pa.Cmwlth. 1995). It is the WCJ's function "to weigh the evidence and resolve conflicting testimony." *Alpo Petfoods, Inc. v. Workmen's Compensation Appeal Board (Neff)*, 663 A.2d 293, 295 (Pa.Cmwlth.1995). The WCJ is free to accept, in whole or in part, the testimony of any witness. *Greenwich Collieries*, 664 A.2d at 706.

My first concern is that the majority opinion does not limit its review to the WCJ's factual findings and whether those factual findings are supported in the record. Here, the WCJ found Claimant's testimony credible, emphasizing her personal observation of his manner and demeanor during testimony and the consistency of his testimony and medical evidence. (WCJ Decision, (FOF) ¶ 10). The WCJ *rejected* Employer's evidence to the extent to which it was not consistent with Claimant's testimony. (FOF ¶ 11.) The WCJ, who had the benefit of viewing the witnesses, was well within her discretion to rely upon the testimony of Claimant and to reject that of Employer's witnesses. However, the majority does not begin its analysis by examining whether the WCJ's factual

findings are supported by credited, substantial evidence in the record. Instead, the majority focuses on evidence in the record, not all of which was credited by the WCJ, such as Employer's training materials, pamphlets, and statistics on robberies of Employer's stores in southeastern Pennsylvania, and makes its own factual findings reaching a different conclusion than that reached by the WCJ. For example, the majority refers to evidence that Employer provided Claimant with pamphlets and educational tools on how to handle a robbery in addition to training on workplace violence, some of which addressed robberies and thefts. *PA Liquor Control Board v. Workers' Compensation Appeal Board (Kochanowicz)*, 29 A.3d 105, 110–11 (Pa.Cmwlth. 2011). The majority concludes that, because Claimant admitted that he attended Employer's trainings and received the educational materials, "Claimant could have anticipated being robbed at gunpoint." *Id.* However, one of Employer's pamphlets relied upon by the majority states, "Generally, *robberies occur very infrequently.*" (Pamphlet, R.R. at 119a (emphasis added).) This pamphlet, which describes robberies as "infrequent" and thus *not* normal, contradicts Employer's and the majority's position and supports the findings of the WCJ. Moreover, the majority relies on the mere existence of these materials, along with two or three training sessions in a span of Claimant's thirty-year career, to transform the Event into a normal working condition. This is contrary to the WCJ's finding that such materials were provided to help employees know how to behave in those "infrequent" situations to "best ensure[ ] the safety of the person to whom the gun is pointed, as well as fellow employees and customers" if ever confronted with a workplace crime. (FOF ¶ 13.)

The WCJ, therefore, "[did] not find [the training materials] entirely relevant" to the Event Claimant experienced in this case. (FOF ¶ 13.)

Similarly, the majority relies on Employer's statistics, which the WCJ also did not credit, (FOF ¶ 11), to hold that "robberies of liquor stores are a normal condition of retail liquor store employment in today's society." *PA Liquor Control Board*, 29 A.3d at 111. Those statistics purported to reveal that there had been ninety-nine armed robberies in its southeastern Pennsylvania retail stores since 2002. *Id.* However, there is no explanation as to why Employer uses its statistics from southeastern Pennsylvania, as opposed to Bucks County (where Claimant's store was located), or why Employer did not include a larger area or even the entire state in the statistical evidence. Moreover, there is no methodology explaining how or why the proffered statistics, dating from 2002 for a five-county area, are relevant to prove that this Event is not an abnormal working condition. The statistics do not provide any meaningful insight about the frequency of the *same type of event* that occurred here. In fact, those statistics are potentially misleading given the number of liquor stores in that five-county area and the length of time the statistics cover. Indeed, in Bucks County, there were only three robberies referenced in the statistics, one of which was the Event, one that occurred only within a few weeks of the Event, and one that occurred *after* the Event. (Workplace Violence Report, February 12, 2009, R.R. at 330a; Workplace Violence Report, April 28, 2008, R.R. at 334a; Workplace Violence Report, March 1, 2008, R.R. at 339a.) Moreover, because there is no talismanic number that transforms an abnormal work incident into a normal one, this Court must look to the totality of the circumstances. *RAG (Cyprus)*, 590 Pa. at 430 n. 10, 912 A.2d at

1289 n. 10. Thus, I believe the WCJ was justified in not crediting the statistics presented. Accordingly, I believe the majority's reliance upon evidence the WCJ did not credit in order to support its conclusion is beyond our appellate scope of review as set forth in *RAG (Cyprus)*.

Confining my review to the evidence credited by the WCJ, and examining the record, including all inferences reasonably drawn therefrom in the light most favorable to Claimant, I conclude that there is substantial evidence in the record to support the WCJ's findings. Claimant's credited testimony establishes that the Event was not a normal work condition. Claimant credibly testified that he had worked in or managed over twenty of Employer's retail stores for more than thirty years, and he testified that he had never been involved in anything similar to the Event or any kind of robbery. (WCJ Hr'g Tr. at 12, R.R. at 37a.) If the Event was a normal working condition, the WCJ could conclude that, in over thirty years of experience in more than twenty of Employer's stores, Claimant would have encountered such events. In her findings of fact, the WCJ specifically noted that Claimant was not aware of any specific details of robberies and did not track violence in the area of his store. (FOF ¶ 9.) The abnormality of the Event, particularly in Claimant's store, is further highlighted by the WCJ's finding that Employer had hired security guards at some stores, but did not provide a security guard for Claimant's store. (FOF ¶ 9.) Although Claimant acknowledged that the clientele of this store and others he previously managed raised shoplifting concerns, (WCJ Hr'g Tr. at 20, R.R. at 45a), shoplifting is entirely different from what occurred during the Event. Importantly, Claimant's testimony that, unlike other stores, Employer did not provide Claimant's store with an alarm system

or emergency alarm button, (WCJ Hr'g Tr. at 23, R.R. at 48a), offers additional support to the WCJ's finding of an abnormal working condition in this matter. Employer's decision not to install alarm systems or have guards in Claimant's store undermines the Employer's contention, with which the majority agrees, that armed robberies are normal occurrences since Employer apparently did not consider them likely enough to occur to protect against them. Even the trainings on handling unlikely workplace events were infrequent, with Claimant attending only two or three in his thirty-plus years with Employer. There also is no evidence that Employer provided any protective equipment or gear, as is provided to employees whose jobs entail great personal safety risks as a normal part of their work, such as police or corrections officers. (FOF ¶ 9.) The WCJ could conclude that the armed robbery here, which included having a masked man point a gun at Claimant, bind and tie him to a chair, and prod his head with a gun while inquiring whether Claimant was impatient with him, was *an intense event and beyond a standard robbery*. I believe that such credited evidence constitutes substantial evidence on which the WCJ could base her finding that the Event was an abnormal work condition.

The majority opinion cites *McLaurin v. Workers' Compensation Appeal Board (SEPTA)*, 980 A.2d 186 (Pa.Cmwlth.2009), and *Kennelty v. Workers' Compensation Appeal Board (Schwan's Home Service, Inc.)*, 594 Pa. 12, 13, 934 A.2d 692, 692 (2007) (per curiam), to support its conclusion that the frequency of the occurrence of a particular work condition is considered in determining whether it is an abnormal occurrence. In *McLaurin*, a SEPTA bus driver of six months suffered from PTSD and related conditions after an incident in which several hooded young men entered his bus without paying their fares and, just

before disembarking, one of the young men pulled out a gun and caused the driver to believe he was going to be shot. *McLaurin* is distinguishable because, in that case, the *WCJ credited the employer's witnesses* as to the frequency of operator assaults, the training provided and, *based upon that credited evidence*, determined that the incident was not abnormal. *McLaurin*, 980 A.2d at 189. The case at bar is more similar to *Kennelty*, in which the Supreme Court reversed this Court's determination, holding that this Court disturbed the WCJ's credibility determination. In *Kennelty*, the WCJ had found the employer's evidence credible that the frequency of work-related incidents "experienced by [the claimant] was normal for [the employer's] specific industry" and directed that this Court is "not free to disturb this credibility determination based on competent evidence." *Kennelty*, 594 Pa. at 13, 934 A.2d at 692. The Supreme Court emphasized that the WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight. *Id.* Here, as in *Kennelty*, the WCJ found a party's evidence credible and gave more weight to that evidence; however, notwithstanding those findings, the majority seeks to disturb that credibility determination by relying on other evidence to reach a conclusion contrary to the WCJ's determination. I believe that such disturbance exceeds our scope of review and conflicts with the Supreme Court's admonition in *Kennelty*.

Next, I believe that the majority opinion overemphasizes the role played by the foreseeability of any given workplace event to transform it into a normal working condition. In this regard, the majority opinion seemingly equates "foreseeability" with "normalcy." However, the fact that nearly anything is foreseeable, including a robbery, because robberies do occur, does not

make that event "normal." Although I agree with the majority's statement that there is no bright line test or general standard that we consider in determining whether a particular event is normal or abnormal, I am unwilling to accept the premise that simply because robberies are known to occur, they are a "normal" condition of the workplace. Moreover, because not all robberies are identical, we should not treat them categorically as if they were. It is well settled that these matters require a highly fact-sensitive inquiry into *exactly what occurred* on a case-by-case basis. *Payes v. Workers' Compensation Appeal Board (Commonwealth of PA/State Police)*, 5 A.3d 855, 859–860 (Pa. Cmwlth.2010), *appeal granted*, —— Pa. ——, 20 A.3d 1182 (2011).[4] Indeed, in *RAG (Cyprus)*, the WCJ considered the *type* of "jovial antics" at issue in that case, recognizing that some were normal, but that the offending comments in that case were not normal, and our Supreme Court affirmed. *RAG (Cyprus)*, 590 Pa. at 421, 912 A.2d at 1283. Were we to paint all robberies with the same brush and take the position that robberies are foreseeable and, therefore, an armed robbery is normal, we would abdicate our responsibility to review these matters on a case-by-case basis. Such a broad, inflexible position is not appropriate in matters where this Court is required to perform a highly fact-specific inquiry.

Finally, I question whether the "abnormal working condition" standard should be applied in this matter at all. The requirement that a claimant prove that a psychic injury was not just a subjective reaction to normal workplace events arose from the "inherent difficulty in establishing causation ... because such maladies are intrinsically subjective." *RAG (Cyprus)*, 590 Pa. at 428, 912 A.2d at 1287. In *Martin*, the Supreme Court reviewed the history of psychic injury cases and agreed that the abnormal working condition analysis "was intended to distinguish psychiatric injuries that are compensable because the necessary causal relationship between the employment and mental disability *has been established* from those psychiatric injuries that arise from the employee's subjective reactions to normal working conditions." *Martin*, 523 Pa. at 518–519, 568 A.2d at 164 (emphasis added). Thus, *Martin's* focus was on whether the psychic injury was, in fact, *work related*, or whether it was actually the result of additional non-work factors, such as personality and individual vulnerability. However, unlike in other cases, such as *RAG (Cyprus)* and *Martin*, the occurrence of Claimant's psychic injury is undisputed and its cause has been found to be the Event by both Claimant's and Employer's expert witnesses. Thus, the concern about causation present in psychic injury cases, and which the "abnormal working condition" test addresses, is not present here. Therefore, I question whether that test is applicable under these circumstances.

Accordingly, I would affirm the Order of the Board.

Judge McGINLEY and Judge BUTLER join this dissenting opinion.

---

4. The question on appeal to the Supreme Court, as framed by the petitioner in that case, is whether this Court "erred as a matter of law in concluding that the claimant was not exposed to abnormal working conditions when the WCJ found that he was exposed to an unusual [work] event which made his job more stressful than it had been." *Payes*, —— Pa. at ——, 20 A.3d at 1182.