# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILDFIRE PRODUCTIONS, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-1072-PAF |
| | ) | |
| TEAM LEMIEUX LLC and LEMIEUX GROUP, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 23, 2022
Date Decided: June 29, 2022

Jon E. Abramczyk, Sabrina M. Hendershot, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Daniel H. Shapira, Robert M. Barnes, Daniel J. Stuart, MARCUS & SHAPIRA LLP, Pittsburgh, Pennsylvania; *Attorneys for Plaintiff Wildfire Productions, L.P.*

Kurt M. Heyman, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Patricia L. Glaser, Craig H. Marcus, Nathaniel Wright, GLASER WEIL HOWARD AVCHEN & SHAPIRO LLP, Los Angeles, California; *Attorneys for Defendants Team Lemieux LLC and Lemieux Group, L.P.*

Ryan M. Lindsay, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Intervenor National Hockey League.*

**FIORAVANTI, Vice Chancellor**

In December 2021, the controlling owners of the Pittsburgh Penguins (the "Team"), a member of the National Hockey League (the "NHL"), agreed to transfer a controlling ownership interest in the Team to another investor group. A minority owner of the Team asserted a variety of claims in this court challenging the transaction. The defendants—the transferors of the controlling interest—and the NHL—which has intervened—contend that the plaintiff's claims must be arbitrated before the NHL Commissioner (the "Commissioner"). The court agrees with the defendants and the NHL. Accordingly, the plaintiff's claims are dismissed in favor of arbitration.

## I. BACKGROUND

The facts recited in this Memorandum Opinion are drawn from the Verified Complaint (the "Complaint"),[1] documents integral thereto, and materials submitted by the parties.

### A. The NHL and the Governing Agreements

The NHL is a joint venture consisting of thirty-two member clubs (the "Member Clubs"), including the Team.[2] All of the Member Clubs are signatories to the NHL Constitution.[3] The NHL Constitution provides that each Member Club

---

[1] *See* Dkt. 1, Verified Complaint ("Compl.").

[2] Dkt. 38, Unsworn Declaration of Kevin Acklin ("Acklin Decl.") ¶ 2.

[3] Acklin Decl. ¶ 3; *id.*, Ex. A ("NHL Constitution") at 26.

"accepts and agrees to abide by the foregoing Constitution and each and every alteration, amendment and repeal thereof duly made."[4]  The Commissioner serves as the Chief Executive Officer of the NHL and is "charged with protecting the integrity of the game of professional hockey and preserving public confidence in the League."[5]  The NHL Constitution grants the Commissioner all powers that may be "necessary or appropriate" to fulfill his or her responsibilities.[6]  The Commissioner has "the authority to interpret . . . the provisions of the Constitution . . . and League rules and resolutions, and their application and enforcement."[7]  Most important to the pending motions, Article 6.3(b)(1) provides that the Commissioner "shall have full and exclusive jurisdiction and authority to arbitrate and resolve . . . any dispute that involves . . . two or more holders of an ownership interest in a Member Club of the League."[8]

The NHL requires all direct and indirect owners of Member Clubs to execute a Consent Agreement with the NHL whereby they "agree to be bound by and adhere to all of the terms and provisions of . . . the NHL Constitution," including mandatory

---

[4] NHL Constitution, art. XII.

[5] *Id.*, art. 6.1.

[6] *Id.*, art. 6.3(a).

[7] *Id.*, art. 6.3(d).

[8] *Id.*, art. 6.3(b)(1).

arbitration.[9] Thus, all owners and partners of all Member Clubs hold their interests subject to the provisions of the NHL Constitution.

Defendant Lemieux Group, L.P. ("Lemieux LP") is a Pennsylvania limited partnership that owned and operated the Pittsburgh Penguins at the time this action was filed.[10] Defendant Team Lemieux, LLC ("Lemieux GP," and with Lemieux LP, the "Defendants") is the sole general partner of Lemieux LP.[11] Plaintiff Wildfire Productions, L.P. ("Plaintiff" or "Wildfire") is a limited partner in Lemieux LP.[12]

When Wildfire acquired its membership interest in Lemieux LP in 1999, it executed two agreements contemporaneously. First, it executed a Consent Agreement with the NHL dated September 1, 1999 (the "1999 Consent Agreement").[13] The 1999 Consent Agreement memorialized, *inter alia*, the NHL's consent to the transaction whereby Plaintiff acquired its interest in Lemieux LP.[14] Pursuant to the 1999 Consent Agreement, and in exchange for the NHL's consent to Plaintiff's acquisition of its interest in Lemieux LP, Plaintiff agreed "to be bound by and adhere to all of the terms and provisions of . . . the NHL Constitution."[15] The

---

[9] Acklin Decl., ¶ 4; *id.*, Ex. B ("1999 Consent Agreement") §§ 3(a), 12(a).

[10] Compl. ¶ 16.

[11] *Id.* ¶¶ 14–15.

[12] *Id.* ¶¶ 12–13.

[13] Acklin Decl., ¶ 4; *see* 1999 Consent Agreement.

[14] 1999 Consent Agreement § 1.

[15] *Id.* § 3(a).

1999 Consent Agreement also provides that "[a]ny dispute . . . relating to the subject matter hereof . . . shall be deemed to be a dispute which shall be resolved in accordance with Section 6.3 of the NHL Constitution,"[16] *i.e.*, arbitration before the Commissioner. Section 12(g) of the 1999 Consent Agreement states that

> in the event of any conflict or ambiguity between any term or provision contained in this Agreement and any term or provision of any Transaction Document, the terms of this Agreement shall control and all such conflicts or ambiguities shall be resolved in a manner that will provide the NHL with the maximum protection that may be afforded to it.[17]

Defendants and the NHL are also signatories to the 1999 Consent Agreement, which is governed by New York law.[18]

Concurrent with their execution of the 1999 Consent Agreement, Wildfire and the Defendants also executed an Amended and Restated Limited Partnership Agreement (the "1999 Partnership Agreement").[19] Thereafter, during October 2007, the parties executed a Second Amended and Restated Limited Partnership Agreement (the "2007 Partnership Agreement," and with the 1999 Partnership Agreement, the "Partnership Agreements").[20] The Partnership Agreements cross-

---

[16] *Id.* § 12(a).

[17] *Id.* § 12(g).

[18] *Id.* § 12(c) & p. 21.

[19] Acklin Decl., ¶ 5; *id.*, Ex. C.

[20] Acklin Decl., ¶ 6; *id.*, Ex. D ("2007 Partnership Agreement").

4

reference the 1999 Consent Agreement.[21] The NHL is not a signatory to either the 1999 Partnership Agreement or the 2007 Partnership Agreement.

The Partnership Agreements are governed by Pennsylvania law,[22] and designate Delaware as the venue for disputes between the parties to that agreement. They provide that: "each party hereby agrees that any dispute arising out of this Agreement or the consummation of the transactions contemplated hereby shall be heard in the state or Federal courts situated in Delaware . . . ."[23]

At the time it executed the 2007 Partnership Agreement, Wildfire contemporaneously executed another Consent Agreement (the "2007 Consent Agreement").[24] Both the 2007 Partnership Agreement and the 2007 Consent Agreement expressly affirm the continued validity of the 1999 Consent Agreement. For example, Section 2 of the 2007 Consent Agreement states that "[e]xcept as expressly set forth herein" the provisions of the 1999 Consent Agreement "shall remain in full force and effect."[25] Section 17.2 of the 2007 Partnership Agreement provides that a "Partner shall be individually liable to the Partnership for . . . any

---

[21] Acklin Decl., Exs. C & D ("Partnership Agreements") §§ 17.1–17.2.

[22] *Id.* § 16.3.

[23] *Id.* § 16.12.

[24] *See* Acklin Decl., Ex. E ("2007 Consent Agreement").

[25] 2007 Consent Agreement § 2; *see also id.* § 7(d) (stating that the prior Consent Agreements "shall remain in full force and effect" except as expressly modified in the 2007 Consent Agreement).

breach of the NHL Consent by the Partner" and defines "NHL Consent" as the "Consent Agreement by and among the National Hockey League, Lemieux Group LP, Team Lemieux LLC and each of the Limited Partners, dated as of September 1, 1999."[26] Wildfire, the Defendants, and the NHL are signatories to the 2007 Consent Agreement.

## B. The Challenged Transaction

The Complaint challenges a two-step transaction that would result in Fenway Sports Group ("FSG") obtaining control and a majority ownership interest in the Team. In the first step, on December 31, 2021, two wholly owned subsidiaries of FSG purchased a controlling interest in Lemieux GP from entities owned and controlled by Ron Burkle and Mario Lemieux. FSG, through its acquisition of a controlling interest in Lemieux GP, consequently obtained control of Lemieux LP and the Team.

In the second step of the transaction, FSG will acquire certain limited partner interests in Lemieux Group, which, together with FSG's ownership interest in

---

[26] 2007 Partnership Agreement § 17.2, Glossary. The Partnership Agreements refer to the "NHL Consent" and "NHL Consent Agreement" interchangeably. *Compare* Partnership Agreements § 17.1(d) ("NHL Consent Agreement"—the only usage of that defined term in the agreement), *with* Partnership Agreements § 17.2 ("NHL Consent"—one of seven times that term is used). Only the 2007 Partnership Agreement contains a glossary, which only defines the "NHL Consent Agreement." 2007 Partnership Agreement, Glossary. All indications from the parties point to reading these two terms in the Partnership Agreements interchangeably as well, and the court will do so here.

Lemieux LP through Lemieux GP, will give FSG majority ownership of Lemieux LP, and thus, the Team. Following the consummation of the second step of the transaction, although FSG will have obtained control and a majority ownership interest in Lemieux LP, each of Wildfire, Lemieux GP, and Lemieux LP will continue to hold an ownership interest in the Team.

Wildfire alleges that FSG's acquisition of a controlling interest in Lemieux GP (and thus, FSG's control of Lemieux LP and the Team), violates the 2007 Partnership Agreement, which governs the partnership among members of Lemieux LP. Wildfire asserts that FSG's purportedly invalid acquisition of a controlling interest in Lemieux GP wrongly leaves Wildfire, as a continuing limited partner in Lemieux LP, subject to the "whims" of FSG.[27] Wildfire therefore seeks a variety of relief, including a declaration that FSG's acquisition of a controlling interest in Lemieux GP is null and void.

### C.    Procedural History

Plaintiff filed its Complaint challenging the acquisition on December 9, 2021. Count I seeks a declaratory judgment that the sale is null and void under the terms of the 2007 Partnership Agreement. Count II alleges that Lemieux GP breached its fiduciary duties to Plaintiff. Count III asserts a claim for breach of the covenant of

---

[27] Compl. ¶ 78.

good faith and fair dealing under Pennsylvania law. Count IV asserts a claim for breach of the 2007 Partnership Agreement, which is governed by Pennsylvania law.

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(1) for lack of subject matter jurisdiction. Alternatively, Defendants have moved to dismiss Counts II and III under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The NHL, which intervened on March 21, 2022, has moved to compel arbitration of this action. The NHL has made clear that it takes no position on the merits of the dispute between Wildfire and the Defendants. Instead, the NHL has intervened solely to enforce its right to compel arbitration of this dispute before the Commissioner.[28]

## II.    ANALYSIS

### A.    Standard of Review

"A motion to dismiss based on an arbitration clause goes to the court's subject matter jurisdiction over a dispute and is properly reviewed under Court of Chancery Rule 12(b)(1)." *Legend Nat. Gas II Hldgs., LP v. Hargis*, 2012 WL 4481303, at *4 (Del. Ch. Sept. 28, 2012) (citing *Ishimaru v. Fung*, 2005 WL 2899680, at *13 (Del. Ch. Oct. 26, 2005), and *Acierno v. New Castle Cty.*, 2006 WL 1668370, at *1 n.8

---

[28] Neither the parties nor the intervenor sought expedited proceedings.

(Del. Ch. June 8, 2006)).   Unlike standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6), "the guidelines for the Court's review of [a] Rule 12(b)(1) motion are far more demanding of the non-movant.  The burden is on the Plaintiff[] to prove that jurisdiction exists." *Appriva S'holder Litig. Co., LLC v. Ev3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) (internal quotations omitted).   "In deciding a 12(b)(1) motion to dismiss for want of subject matter jurisdiction, the court may consider documents outside the complaint." *Legend Nat. Gas*, 2012 WL 4481303, at *4 n.25 (citing *Acierno*, 2006 WL 1668370, at *1 n.8).

The arbitration agreements at issue do not provide for applicability of the Delaware Uniform Arbitration Act ("DUAA").   Therefore, the Federal Arbitration Act ("FAA")[29] governs the motion to compel arbitration.[30]   The FAA, in turn, implicates state law contract principles.   "When deciding whether the parties agreed to arbitrate . . . [the issue of] arbitrability" under the FAA, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Acct.*, 618 F.3d 277, 288 (3d Cir. 2010), *as amended* (Dec. 7, 2010).

---

[29] 9 U.S.C. § 1 *et seq.*

[30] *See* 10 *Del. C.* § 5702(c); *Gulf LNG Energy, LLC v. Eni USA Gas Mktg. LLC*, 242 A.3d 575, 579 n.11 (Del. 2020) ("Because the parties did not designate the [DUAA], the FAA governs their arbitration.").

The FAA reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (internal quotations omitted). "[T]he public policy of [Delaware likewise] favors the resolution of disputes through arbitration." *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 911 (Del. 1989); *see also MacPherson v. Magee Mem'l Hosp. for Convalescence*, 128 A.3d 1209, 1219 (Pa. Super. Ct. 2015) (same for Pennsylvania); *Smith Barney Shearson Inc. v. Sacharow*, 689 N.E.2d 884 (N.Y. 1997) (same for New York). "A strong presumption exists in favor of arbitration, and, accordingly, contractual arbitration clauses are generally interpreted broadly by the courts. However, this presumption will not trump basic principles of contract interpretation." *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430 (Del. Ch. 2007).

Accordingly, the FAA requires that a court "*shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). When a contract contains an arbitration clause, there is a "presumption of arbitrability" unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotations omitted). That presumption is particularly applicable when the arbitration clause is broad—when, for example, it covers any dispute "relating to"

10

or "arising out of" certain subject matter. *See Orix LF, LP v. Inscap Asset Mgmt., LLC*, 2010 WL 1463404, at \*7 (Del. Ch. Apr. 13, 2010) (noting the "broad" reach of the phrase "relating to" in an arbitration clause); *ASDC Hldgs., LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, 2011 WL 4552508, at \*8 n.38 (Del. Ch. Sept. 14, 2011) (noting broad import of "'involving or relating to' language" in an arbitration clause (citation omitted)). Any "[d]oubts" as to arbitrability "should be resolved in favor of coverage." *AT&T Techs.*, 475 U.S. at 650; *see Centene Corp. v. Accellion, Inc.*, 2022 WL 898206, at \*7, 13 (Del. Ch. Mar. 28, 2022) (discussing the breadth of an arbitration provision governing "any dispute" regarding the agreement and concluding that it was not limited to colorable or bona fide claims and that it extended to defenses to a claim).

## B. The NHL's Argument

The Defendants and the NHL make similar, but not identical, arguments in support of their motions to compel arbitration. The court's analysis focuses primarily on the NHL's arguments, because they are dispositive. The NHL relies on the arbitration provision in the NHL Constitution and the arbitration provision in the 1999 Consent Agreement.[31]

---

[31] The parties and the NHL have proceeded as though the court, and not an arbitrator, has the obligation to decide whether the claims must be arbitrated.

### 1. The NHL Constitution

Article 6.3(b) of the NHL Constitution provides the Commissioner with

> full and exclusive jurisdiction and authority to arbitrate and resolve: (1) *any dispute* that involves . . . two or more holders of an ownership interest in a Member Club of the League; . . . and (5) any dispute involving a Member Club . . . that *in the opinion of the Commissioner* is detrimental to the best interests of the League or professional hockey or involves or affects League policy.[32]

The NHL Commissioner has invoked both provisions to enforce the NHL's right to arbitration.[33]

There is no disagreement that Wildfire's claims in this action present a dispute that involves two or more holders of an ownership interest in the Team. As Wildfire alleges, Lemieux LP is a limited partnership that "owns the Pittsburgh Penguins," and Lemieux GP is the sole general partner of Lemieux LP in which it possesses about a "31.34% interest."[34] Wildfire, in turn, is a limited partner in—and "owns approximately 7.5%" of—Lemieux LP.[35] The Complaint details Wildfire's dispute with Lemieux GP and Lemieux LP over the transfer of ownership interests in the Team. Wildfire also does not contest that this dispute is one involving the Team that

---

[32] NHL Constitution, art. 6.3(b) (emphasis added).

[33] Dkt. 57 ("Hrg.") at 34:5–12.

[34] Compl. ¶¶ 1, 15.

[35] *Id.* ¶¶ 12–13, 27.

the NHL Commissioner has opined to be detrimental to the best interests of the NHL or involves or affects NHL policy.

The NHL points to the decision in *Commodore Trust v. Predators Holdings, LLC*, 16-674-BC (Tenn. Ch. Ct. July 29, 2016), as further support to compel arbitration under Article 6.3(b) of the NHL Constitution. In *Commodore Trust*, the Tennessee Chancery Court held that Article 6.3(b)(1) and 6.3(b)(5) of the NHL Constitution compelled holders of an indirect ownership interest in the Nashville Predators to submit their claims to the Commissioner's full and exclusive arbitral jurisdiction. Based on their owners' consent agreements, the court first held that the parties "agree[d] to be bound by the NHL Constitution and its arbitration provisions." *Id.* at 5. Next, the court held that Article 6.3(b)(1) of the NHL Constitution required the plaintiffs to arbitrate their claims before the Commissioner because the plaintiffs' indirect holdings in the Predators constituted an "ownership interest" as that term is defined in Article 3.5 of the NHL Constitution. *Id.* at 10. Because the plaintiffs' claims involved a member club (the Predators) and could be detrimental to the NHL, the court likewise ordered arbitration before the Commissioner under Article 6.3(b)(5) of the NHL Constitution. *Id.* at 12–13. As the court explained, the plaintiffs' claims and request for relief could be detrimental to the best interests of the NHL because the plaintiffs alleged that holders of ownership interests in the Predators "breached duties and contracts and have

13

committed torts" against others in the ownership chain, and such issues "link back to the Commissioner's duty in Article 6.1 [of the NHL Constitution] to preserve public confidence in the League." *Id.* at 12.

As in *Commodore Trust*, Wildfire signed the 1999 Consent Agreement as a condition to acquiring an ownership interest in the Team, and in doing so, expressly agreed "to be bound by and adhere to" the NHL Constitution.[36] Wildfire then reaffirmed that agreement again in October 2007 at the same time it entered into the 2007 Partnership Agreement.[37] In particular, Wildfire confirmed and agreed that except as "expressly set forth" therein, nothing in the subsequent owners' consent agreements shall amend, modify, waive or otherwise affect any term or provision of the 1999 Consent Agreement, each of which "shall remain in full force and effect." As in *Commodore Trust*, NHL Constitution Article 6.3(b)(1) and 6.3(b)(5) each independently require Wildfire to arbitrate its claims before the Commissioner. First, Article 6.3(b)(1) requires arbitration before the Commissioner because Wildfire, Lemieux LP, and Lemieux GP all hold an "ownership interest" in the Penguins, as that term is used in the NHL Constitution—*i.e.*, "any . . . partnership

---

[36] 1999 Consent Agreement §§ 1(a), 3(a)(A).

[37] Prior to executing the 2007 Consent Agreement, Wildfire had executed three other agreements with the NHL between October 2000 and August 2007 that confirmed the vitality of the 1999 Consent. *See* Dkt. 39, Unsworn Declaration of David Zimmerman ("Zimmerman Decl."), Exs. D–F.

(general or limited) or other proprietary holding in any . . . partnership, or other organization which holds, directly or indirectly, the franchise of Member Club."[38] As in *Commodore Trust*, Article 6.3(b)(5) of the NHL Constitution requires Wildfire to arbitrate its claims before the Commissioner because the Commissioner reasonably considers that matters in dispute could be "detrimental to the best interests" of the NHL.[39]

### 2.    The 1999 Consent Agreement

The NHL also invokes the Section 12(a) of the 1999 Consent Agreement as an independent basis to compel arbitration.  Section 12(a) provides:

> *Any dispute* between or among the Acquiring Parties [including Wildfire and the Defendants], or any of them, relating to the subject matter hereof . . . shall be deemed to be a dispute which shall be resolved in accordance with Section 6.3 of the NHL Constitution and the Commissioner shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute.[40]

Wildfire asserts that this clause does not apply to its claims against the Defendants because the claims asserted in this action do not relate to the "subject matter" of the 1999 Consent Agreement.[41]   The NHL argues that Wildfire's construction of Section 12(a) is contrary to the plain language of the agreement.  The

---

[38] NHL Constitution, art. 3.5.

[39] *Id.*, art. 6.3(b)(5).

[40] 1999 Consent Agreement § 12(a) (emphasis added).

[41] Dkt. 43 ("Pl.'s Ans. Br.") at 39–41.

15

NHL again relies on *Commodore Trust*, which analyzed a nearly identical provision. The provision at issue in *Commodore Trust* required owners of the Predators to arbitrate before the Commissioner "any dispute . . . relating to the subject matter" of their owners' consent agreement. *Commodore Tr.*, 16-674-BC, at 3. The court reasoned that because the owners' consent agreement contained numerous terms relating to future, "ongoing events," the "subject matter" of the owners' consent agreement—and thus, its provision requiring arbitration before the Commissioner—covered the "ongoing operations of the Club." *Id.* at 4–5. Because the plaintiffs' claims concerned the "ongoing operations of the [Predators]," the court compelled arbitration before the Commissioner. *Id.* at 5–6.

The NHL argues that, as in *Commodore Trust*, Section 12(a) of the 1999 Consent Agreement requires Wildfire to arbitrate its claims before the Commissioner because the 1999 Consent Agreement also contains terms that apply to ongoing events beyond the ownership transaction consummated in 1999. Thus, the "subject matter" of the 1999 Consent Agreement—and in turn, its provision requiring arbitration before the Commissioner—covers claims relating to the ongoing operations of the Team, as do Wildfire's claims here. For example, Wildfire's claims relate to the ongoing operations of the Team because they concern whether FSG validly obtained a controlling interest in Lemieux GP, through which

16

it obtained control of Lemieux LP and the Team.[42]  Indeed, Wildfire alleges that its claims "arise[] out of the attempted sale of a controlling stake in [Lemieux LP]," and concern issues of "voting control," including whether Wildfire will have "any meaningful vote on Partnership matters" going forward.[43]  Those "Partnership matters" reasonably include the operation of the Team.  Any uncertainty as to who operates and controls the Team—regardless of whether Wildfire or the Defendants are ultimately correct on the merits of their dispute—necessarily affects the Team's continued relationship with the NHL, other NHL member clubs, NHL licensees, sponsors, players, and fans alike.  Wildfire's cramped reading of the 1999 Consent Agreement is unpersuasive and is contrary to the sound reasoning in *Commodore Trust*.  Accordingly, because Wildfire's claims concern the "subject matter" of the 1999 Consent Agreement, they must be submitted to the Commissioner's full and exclusive arbitral jurisdiction pursuant to Section 12(a) of the 1999 Consent Agreement.

### C.  Wildfire's Reliance on the 2007 Partnership Agreement

Wildfire insists that the 2007 Partnership Agreement controls this case, not the NHL Constitution or the 1999 Consent Agreement.  Wildfire essentially advances three arguments as to why the motions must be denied and that the 2007

---

[42] *See, e.g.*, Compl. ¶¶ 1–10.

[43] *Id.* ¶¶ 1, 3 n.1, 45–46.

Partnership Agreement mandates that its claims be litigated in this court. First, Section 16.12 of the 2007 Partnership Agreement provides for Delaware to be the exclusive venue for disputes between the parties, and the agreement is fully integrated under Section 16.14. Second, Wildfire asserts that the NHL "approved" the Partnership Agreements. Third, although the NHL insisted that the 2007 Partnership Agreement incorporate certain provisions from the 1999 Consent Agreement, an arbitration provision—which is notably absent from the 2007 Partnership Agreement—was not one of them.

### 1.    The Exclusive Venue Provision

Wildfire contends that an exclusive forum provision in the 2007 Partnership Agreement allows Wildfire to proceed in this forum.[44]   That provision states, in pertinent part:

> *Dispute Resolution*.  As a material term of this Agreement, *each party* hereby agrees that any dispute arising out of this Agreement or the consummation of the transactions contemplated hereby shall be heard in the state or Federal courts situated in Delaware and, in connection therewith, each party hereby consents to the jurisdiction and venue of such courts and waives its right to a jury trial.  Each party agrees that any challenge to the provisions of this Section 16.12 shall constitute a material breach of this Agreement.[45]

---

[44] *Id.* ¶ 11.

[45] 2007 Partnership Agreement § 16.12 (emphasis added).

Wildfire maintains that the 2007 Partnership Agreement trumps the arbitration provisions of the 1999 Consent Agreement and the NHL Constitution because the 2007 Partnership Agreement is a fully integrated contract that contains no arbitration provision, and purportedly "supersedes" all other agreements.[46]    Wildfire's argument suffers from at least two fatal flaws.  First, the dispute resolution provision in the 2007 Partnership Agreement expressly binds "each party" to that agreement. The NHL is not a party to that agreement.  Wildfire, the Defendants, and the NHL are, however, parties to the 1999 Consent Agreement and the 2007 Consent Agreement, both of which require arbitration of certain disputes, either directly or by the parties' acceptance of the NHL Constitution.[47]

The 2007 Partnership Agreement does not supersede the NHL Constitution or the 1999 Consent Agreement, because the NHL is not a party to the 2007 Partnership Agreement (or the 1999 Partnership Agreement).  As a matter of black letter contract law, parties cannot modify a contract without the "assent" of "all . . . parties to the contract."  *Brooklyn Union Gas Co. v. NewFields Cos., LLC*, 2020 WL 7770993, at *5 (E.D.N.Y. Dec. 30, 2020); *Trombetta v. Raymond James Fin. Servs., Inc.*, 907

---

[46] Pl.'s Ans. Br. 12–14.

[47] 1999 Consent Agreement §§ 3(a)(A) (agreeing to be bound and adhere to the NHL Constitution), 12(a) (agreeing to arbitrate disputes regarding the 1999 Consent Agreement in accordance with the NHL Constitution); 2007 Consent Agreement §§ 2 (reaffirming the validity of the 1999 Consent Agreement), 7(b) (agreeing to arbitrate disputes regarding the 2007 Consent Agreement in accordance with the NHL Constitution).

19

A.2d 550, 558 (Pa. Super. Ct. 2006) (same under Pennsylvania law). Accordingly, "a later contract's forum-selection clause" cannot "supersede[] a prior contract's choice of forum" clause when "not all parties to the prior agreement signed the later one." *Brooklyn Union*, 2020 WL 7770993, at \*5 (citing *PB Life & Annuity Co. v. Universal Life Ins. Co.*, 2020 WL 2476170, at \*10 n.6 (S.D.N.Y. May 12, 2020)); *see also Oldcastle Precast, Inc. v. VPMC, Ltd.*, 2013 WL 1952090, at \*20–21 (E.D. Pa. May 13, 2013) (holding that under Pennsylvania law, obligations in a prior contract cannot be "extinguishe[d]" or "superseded by" a "subsequent contract" that is not "between the same parties"). Thus, the 2007 Partnership Agreement, to which the NHL was not a party, does not abrogate the NHL's express contractual right granting the Commissioner full and exclusive jurisdiction to arbitrate this dispute under the NHL Constitution and the 1999 Consent Agreement, which Wildfire and the Defendants reaffirmed in their Consent Agreements with the NHL.

Wildfire, the Defendants, and the NHL all executed the 2007 Consent Agreement contemporaneously with the Defendants' and Wildfire's signing of the 2007 Partnership Agreement. The 2007 Consent Agreement confirms that all parties agreed that "[e]xcept as expressly set forth herein, nothing in this Agreement shall amend, modify, waive or otherwise affect in any way any of the provisions of the

[1999 Consent Agreement] . . . , *each of which shall remain in full force and effect*."[48]

The terms of the 1999 Consent Agreement include Wildfire's agreement to be bound by and adhere to the NHL Constitution, along with its agreement to arbitrate disputes before the Commissioner under Section 12(a). Those agreements were express conditions of the NHL's consent to Wildfire acquiring its ownership interest in the Team.[49]

### 2. The NHL's "Approval" of the 2007 Partnership Agreement

Wildfire next argues that, even though the NHL is not a party to the 2007 Partnership Agreement, the NHL should be held to the terms of the 2007 Partnership Agreement because it "approved both the original 1999 Partnership Agreement and the 2007 Partnership Agreement, each of which contain the Mandatory Dispute Resolution Clause."[50] Wildfire cites no authority to treat the NHL as a party to the 2007 Partnership Agreement merely because it purportedly approved the Partnership Agreements.[51]

---

[48] 2007 Consent Agreement § 2 (emphasis added).

[49] 1999 Consent Agreement §§ 1(a), 3(a)(A); *see also* Zimmerman Decl. ¶ 10.

[50] Pl.'s Ans. Br. 18.

[51] The NHL argues that Wildfire overstates the extent of the NHL's approvals in 1999 and 2007 in connection with the Partnership Agreements. First, Wildfire cites no specific document or evidence indicating that the NHL "approved" the Partnership Agreements themselves. Hrg. 40:6–9. Second, the NHL argues that it approved the transaction, but not all of the terms of the transaction documents. *Id.* at 40:11–23. That argument finds support in Section 7(h) of the 2007 Consent Agreement, which states that the Defendants and Wildfire "acknowledge and agree that the NHL has reviewed the Transaction

21

The NHL argues that there is no evidence or allegation in the Complaint that the NHL approved the Partnership Agreements. In addition, Wildfire's assertion that in 2007, the NHL purportedly "approved" Section 16.12 of the 2007 Partnership Agreement as the controlling dispute resolution provision contradicts the plain language of Section 2 of the 2007 Consent Agreement. Section 2 of the 2007 Consent Agreement, which was signed the same day as the 2007 Partnership Agreement, incorporates the terms of the 1999 Consent Agreement, stating that: "*[e]xcept as expressly set forth herein*, nothing in this [Consent] Agreement shall amend, modify, waive or otherwise affect in any way any of the provisions of the [1999 Consent Agreement] . . . , *each of which shall remain in full force and effect*."[52] Wildfire does not identify any language in the 1999 Consent Agreement or the 2007 Consent Agreement wherein the NHL expressly "approved" Section 16.12 of the 2007 Partnership Agreement as amending or waiving the NHL's right to arbitrate disputes pursuant to the 1999 Consent Agreement or the NHL Constitution.

---

Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents. 2007 Consent Agreement § 7(h). That provision goes on to say that "in the event of any conflict or ambiguity between any term or provision contained in this Agreement and any term or provision of any Transaction Document, the terms of this Agreement shall control and all such conflicts or ambiguities shall be resolved in a manner that will provide the NHL with the maximum protection that may be afforded to it." *Id.*

[52] 2007 Consent Agreement § 2 (emphasis added).

Wildfire argues that the simultaneous entry into one agreement containing an arbitration provision and another agreement which does not (the 2007 Partnership Agreement) is "'convincing evidence that in instances in which the parties intended a particular dispute to be subject to arbitration, a provision creating such an obligation was included in the controlling agreement.'" Pl.'s Ans. Br. 29 (quoting *Bianchini v. Waco Int'l Distrib. Corp.*, 1992 WL 7038, at \*2 (E.D. Pa. Jan. 9, 1992)). *Bianchini* does not support Wildfire's position. *Bianchini* involved several agreements executed by the *same* parties. Unlike in *Bianchini*, the NHL is not a party to all of the agreements. It is, however, a party to the agreements with Wildfire that require arbitration of disputes before the NHL Commissioner.

### 3.    The Absence of an Arbitration Provision

Next, Wildfire argues that the exclusive forum provision in the 2007 Partnership Agreement controls this dispute because the NHL demanded, and the parties to the 2007 Partnership Agreement included, express restrictions and requirements that supersede any other provision in the 2007 Partnership Agreement and arbitration was not one of them.[53] Wildfire argues the decision not to include an arbitration provision in the 2007 Partnership Agreement was a deliberate decision of the parties to the agreement and the NHL.[54]

---

[53] Pl.'s Ans. Br. 13.

[54] *Id.* at 14.

Wildfire's argument is inconsistent with the plain language of the agreement. Section 17.1 of the 2007 Partnership Agreement begins as follows: "The NHL Consent requires the inclusion of the following provisions . . . ."[55] The corresponding section 5(d) of the 1999 Consent Agreement sets forth those required provisions.[56] Section 17.1 of the Partnership Agreements reflects language that the NHL required to be included in the agreement between the Defendants and the members of the limited partnership. Nowhere in the Partnership Agreements or the 1999 Consent Agreement did the NHL indicate it was waiving its contractual right to require members to arbitrate disputes.

**D.    The NHL Has not Waived its Rights Under an Estoppel Theory.**

As a general rule, "only the formal parties to a contract are bound by its terms." *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *3 (Del. Ch. May 14, 2009) (internal quotations omitted). Wildfire seeks to circumvent that rule through the equitable doctrine of estoppel. Specifically, Wildfire relies on a line of cases that prevents non-parties to a contract from avoiding exclusive forum or mandatory arbitration clauses. Under that line of cases, a court may enforce a forum selection provision against a non-signatory if:

> (i) the agreement contains a valid forum selection provision; (ii) the non-signatory has a sufficiently close relationship to the agreement,

---

[55] 2007 Partnership Agreement § 17.1.

[56] 1999 Consent Agreement § 5(d).

either as an intended third-party beneficiary under the agreement or under principles of estoppel; and (iii) the claim potentially subject to the forum selection provision arises from the non-signatory's standing relating to the agreement.

*Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1090 (Del. Ch. Aug. 17, 2021); *Cap. Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *5 (Del. Ch. Oct. 29, 2004).[57]

The doctrine of equitable estoppel serves to bind "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the forum selection clause in the contract." *Armour*, 2004 WL 2521295, at *6. The doctrine "prevents the non-signatory from accepting the benefits of the agreement without also accepting its burdens, including the forum selection provision." *Flotek*, 262 A.3d at 1074. When applying the doctrine, a court must "proceed with a good deal of caution . . . lest nuanced concepts of equity be allowed to override established legal principles of contract formation." *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d

---

[57] When determining whether the non-signatory has embraced the contract, the court may also consider whether "(i) the non-signatory accepted a direct benefit from the agreement or (ii) the non-signatory had a close relationship to the agreement, a signatory to the agreement controlled the non-signatory, and the circumstances establish that the signatory agreed to the forum selection provision on behalf of its controlled affiliate." *Flotek*, 262 A.3d at 1090. The benefit may be pecuniary or non-pecuniary. *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019). But the party must have actually received the benefit; "the mere 'contemplation' of a benefit does not directly confer one." *Id.*

25

417, 433 n.35 (Del. Ch. 2007). Because "significant due process considerations [are] implicated where forum-selection clauses are applied to a non-signatory," courts must be doubly cautious when asked to expand the doctrine's reach. *Europa Eye Wear Corp. v. Kaizen Advisors, LLC*, 390 F. Supp. 3d 228, 232 (D. Mass. 2019). The estoppel paradigm is ill equipped to address this case. Wildfire is not seeking to compel the NHL to defend against claims in Delaware.

Wildfire's estoppel theory, in essence, is akin to arguing that the NHL has implicitly waived its right to enforce the express arbitration requirements of the 1999 Consent Agreement and Article 6.3(b) of the NHL Constitution as a result of the 2007 Partnership Agreement, to which the NHL is not a party. Under Pennsylvania law,

> a waiver of a right to proceed to arbitration pursuant to the term of a contract providing for binding arbitration should not be lightly inferred and unless one's conduct has gained him an undue advantage or resulted in prejudice to another he should not be held to have relinquished the right.

*Keystone Tech. Grp., Inc. v. Kerr Grp., Inc.*, 824 A.2d 1223, 1226 (Pa. Super. Ct. 2003) (quoting *Kwalick v. Bosacco*, 478 A.2d 50, 52 (Pa. Super. Ct. 1984)); *see also Singer v. Jefferies & Co.*, 575 N.E.2d 98 (N.Y. 1991); *accord Halpern Med. Servs., LLC v. Geary*, 2012 WL 691623, at *3 (Del. Ch. Feb. 17, 2012). Here, Wildfire fails to establish that any such circumstances exist, and its waiver argument is without merit. *See Agspring, LLC v. NGP X US Hldgs., L.P.*, 2022 WL 170068, at *7 (Del.

26

Ch. Jan. 19, 2022) (affirming that party was not "estopped" from enforcing and had not "waive[d] its rights" under "arbitration provisions" of one contract, on the ground that the party allegedly took an "inconsistent position" in another contract).

The NHL is not asserting claims against Wildfire in another jurisdiction. Of the nine cases Wildfire cites as a basis to support its estoppel theory, none applied equitable estoppel to bind a party to a term in a contract it did not sign, in lieu of and in order for a plaintiff to evade an express requirement in its own contract with the other party.[58]

In *Plaze, Inc. v. Callas*, 2019 WL 1028110 (Del. Ch. Feb. 28, 2019), Justice, then-Vice-Chancellor, Montgomery-Reeves rejected a similar estoppel argument to what Wildfire makes here. The plaintiff in *Plaze* sued various signatories to a contract, in which only some were defined as "Parties" covered by a forum selection clause. *Id.* at *1–3. Invoking equitable estoppel, the plaintiff argued that those signatories who were not defined as "Parties" covered by the forum selection clause

---

[58] *See* Pl.'s Ans. Br. 20–27. *See, e.g.*, *McWane, Inc. v. Lanier*, 2015 WL 399582, at *6–8 (Del. Ch. Jan. 30, 2015) (holding non-signatories subject to forum selection clause where the agreement to which they were parties contained only a consent to jurisdiction provision); *River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2020 WL 2220148, at *3–5 (D. Del. May 7, 2020) (exclusive forum provision in one contract that bound non-signatory); *BE&K Eng'g Co., LLC v. RockTenn CP, LLC*, C.A. No. 8837-VCL (Del. Ch. Sept. 27, 2013) (TRANSCRIPT), at 120–21 (non-signatory to contract held subject to its exclusive forum provision as to claims it was asserting under the contract); *Armour*, 2004 WL 2521295, at *5–7 (applying equitable estoppel in the alternative to obtain personal jurisdiction over non-signatory who did not assert existence of a competing contract).

27

should nevertheless be bound to that clause because they were "third-party beneficiaries or entities closely related to the contract." *Id.* at *8. The court rejected that argument, holding that the non-Party signatories did "not seek to benefit from the contract without accepting their obligations," but rather, expressly "bargained" for specific rights, which equity would not override in favor of terms for which "other parties bargained." *Id.* at *9.

Wildfire's argument is even weaker. Unlike the plaintiff in *Plaze*, who unsuccessfully attempted to invoke equity to bind a signatory to a forum selection term in its own contract when the signatory did not agree to that term, Wildfire seeks here to bind the NHL to the forum selection provision of the 2007 Partnership Agreement that the NHL did not sign and to which it did not agree. Additionally, Wildfire seeks to do so in contravention of express arbitration requirements agreed to by Wildfire, the Defendants, and the NHL pursuant to the 1999 Consent Agreement and Article 6.3(b) of the NHL Constitution, as reaffirmed in four subsequent owners' consent agreements, including the 2007 Consent Agreement, which Wildfire, the Defendants, and the NHL executed on the same day that Wildfire and the Defendants executed the 2007 Partnership Agreement. The estoppel theory breaks down when the non-signatory and the party seeking to enforce a forum selection clause are also parties to a separate, contemporaneous agreement with a

28

broad arbitration provision.[59]  Otherwise, a plaintiff could vitiate the parties' "freedom . . . in commerce to strike bargains," when the law instead requires contracts to be "honor[ed] and enforce[d] . . . as plainly written." *TR Inv'rs, LLC v. Genger*, 2013 WL 603164, at *20 n.198 (Del. Ch. Feb. 18, 2013) (internal quotations and citation omitted).  The court declines to accept an equitable estoppel theory to override Wildfire's express contractual bargain with the NHL.[60]

### E.  The Arbitration and Delaware Venue Provisions Are Easily Harmonized.

Wildfire acknowledges that "[t]he Court's task is to *harmonize* various agreements, not go looking for hypothetical conflicts with other agreements."[61]

---

[59] *See, e.g.*, *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *13–15 (Del. Ch. Sept. 22, 2016) (holding that when a party who sought to use equitable estoppel to compel arbitration was "a party to another agreement with the party" against whom it sought to use estoppel, and "that other agreement [was] central to the dispute and it contain[ed] an express forum selection provision," the party invoking estoppel could not rely on such a doctrine to "have the Court vary the terms of its contracts [with the other party] to compel a result for which it did not bargain"); *TR Inv'rs, LLC v. Genger*, 2013 WL 603164, at *3, 20 (Del. Ch. Feb. 18, 2013) (declining to "override the parties' bargain" based on equity).

[60] *See Heartland Del. Inc. v. Rehoboth Mall Ltd. P'ship*, 57 A.3d 917, 925 (Del. Ch. Aug. 27, 2012) ("Equity . . . will not rewrite a contract to save a party from its own negligence."); *Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) ("TMM cannot invoke general equity principles" when it has "contracted away its right to undertake actions . . ."); *Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *6 (Del. Ch. June 27, 2019) (observing that a court should not "invoke equitable principles to override the plain language of [a contract]"); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, *13–14 (Del. Ch. May 10, 2018) ("[H]aving bargained for certain contractual rights against [the defendant], and for certain remedies, [the plaintiff] cannot use equity to circumvent the results of its bargain.").

[61] Pl.'s Ans. Br. 30.

Accepting that invitation, the court finds it relatively easy to harmonize the forum provision in the 2007 Partnership Agreement and the arbitration provisions of the NHL Constitution and the Consent Agreements.

The NHL Constitution and the Consent Agreements give the Commissioner the authority to require arbitration of certain disputes involving the league and its Member Clubs before the Commissioner. Among those disputes are disputes between owners of any Club. The NHL Constitution and the 1999 Consent Agreement do not mandate arbitration in all qualifying disputes; instead, they give the NHL Commissioner the option to assert jurisdiction over those disputes. For example, Section 6.3(b) of the NHL Constitution provides, in pertinent part: "The Commissioner may elect not to arbitrate a dispute in any circumstances that he determines appropriate."[62] Similarly, Section 12(a) of the 1999 Consent Agreement, provides: "If the Commissioner shall give written notice to the parties that he has elected not to arbitrate and resolve such dispute, such dispute shall be resolved in accordance with any applicable agreements between the parties and any applicable law."[63]

Viewed in this light, the arbitration provisions in the NHL Constitution and the 1999 Consent Agreement give the Commissioner the preemptive right to assert

---

[62] NHL Constitution § 6.3(b).

[63] 1999 Consent Agreement § 12(a).

30

jurisdiction and to arbitrate qualifying disputes. But if the Commissioner declines to exercise that authority, then the parties to the 2007 Partnership Agreement are free to provide for an exclusive forum to govern their dispute. Here, the parties to the 2007 Partnership Agreement chose the courts of Delaware as the exclusive forum for disputes under that agreement which either: (1) were not within the scope of matters subject to arbitration under the NHL Constitution and the Consent Agreements or (2) were within the scope of those provisions, but the Commissioner elected not to assert jurisdiction. The claims in this action fall within the scope of the arbitration provisions, and the Commissioner has invoked his authority to arbitrate this dispute. Doing so does not vitiate the venue provision of the 2007 Partnership Agreement. Section 16.12 of the 2007 Partnership Agreement is subordinate to the arbitration provisions of the NHL Constitution and the 1999 Consent Agreement, to which Wildfire and the Defendants have agreed and accepted.

F. **The Consent Agreements Provide that Any Conflict or Ambiguity Must be Resolved in favor of the NHL.**

Section 12(g) of the 1999 Consent Agreement (hereinafter the "Conflicts Clause") states:

> [I]n the event of any conflict or ambiguity between any term or provision contained in this [Consent] Agreement and any term or provision of [the 1999 Partnership Agreement], *the terms of this Agreement shall control and all such* conflicts or ambiguities shall be

31

resolved in a manner that will provide the NHL with the maximum protection that may be afforded to it.[64]

An identical provision is found in the 2007 Consent Agreement.[65] Pursuant to the Conflicts Clause, the Consent Agreements "control" in all respects over the concurrently executed Partnership Agreements. Plaintiff seeks to defeat the parties' express intent by arguing that the venue clause in Section 16.12 of the 2007 Partnership Agreement (the "Venue Clause") controls over the arbitration clause in Article 6.3(b) of the NHL Constitution mandated by the Consent Agreements, and the separate arbitration clauses located in the Consent Agreements. Plaintiff's argument is antithetical to and belied by the Conflicts Clause.

The court concludes that the Venue Clause in the 2007 Partnership Agreement and the arbitration clauses in the 1999 Consent Agreement and the NHL Constitution can and do co-exist. But even if these provisions could not co-exist, Section 12(g) of the 1999 Consent Agreement resolves any conflict in favor of arbitration. In *Karish v. SI International, Inc.*, 2002 WL 1402303 (Del. Ch. June 24, 2002), the parties executed two related agreements on the same day; both agreements included integration clauses, but only one agreement included an arbitration clause. *Id.* at *1– 2. The agreement with the arbitration clause included the following conflicts clause:

---

[64] 1999 Consent Agreement § 12(g) (emphasis added).

[65] 2007 Consent Agreement § 7(h).

32

"wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control." *Id.* at *2 (bracketing omitted). The plaintiff sued under the agreement without the arbitration clause. *Id* at *3. This court held that, because the two agreements were executed concurrently and coordinated, "they form[ed] one contract and must be examined as such." *Id.* Next, the court held that the conflicts clause "provide[d] the solution" and, because the agreement with the arbitration clause controlled the other agreement, "the arbitration clause [would] control." *Id.* Hence, the court ordered arbitration. *Id.* at *5. That reasoning is equally applicable here as an alternative basis for compelling arbitration.

### G. Wildfire's Challenge to the Commissioner's Impartiality and Qualifications Is Premature and Unpersuasive.

Wildfire suggests that it should be permitted to proceed in this court because the Commissioner is "conflicted" and "biased" and cannot be trusted to impartially arbitrate this dispute.[66] According to Wildfire, the Commissioner cannot resolve this matter impartially because the NHL "has already approved and supports the Proposed Transaction at the heart of" this dispute.[67] In addition, Wildfire suggests that only a "Delaware judge" has "the special expertise necessary to resolve" Wildfire's claims.[68]

---

[66] Pl.'s Ans. Br. 44–48.

[67] Zimmerman Decl., Ex. L at 1; Pl.'s Ans. Br. 45–46.

[68] Zimmerman Decl., Ex. J at 5.

None of these arguments defeat the Commissioner's jurisdiction. First, "it is well established" that a court "cannot entertain an attack upon the qualifications or partiality of arbitrators until after the conclusion of the arbitration and the rendition of an award." *Hojnowski v. Buffalo Bills, Inc.*, 995 F. Supp. 2d 232, 239 (W.D.N.Y. 2014) (internal quotations omitted) (rejecting challenge to NFL Commissioner as arbitrator); *Commodore Tr.*, 16-674-BC, at 17–18 (rejecting challenge to NHL Commissioner's impartiality because the remedy for any such claim "is upon the completion of the arbitration"); *Alexander v. Minn. Vikings Football Club LLC*, 649 N.W.2d 464, 467 (Minn. Ct. App. 2002) (similar ruling regarding NFL Commissioner). Any challenge to the Commissioner's qualifications or impartiality therefore fails as premature.

Second, Wildfire cannot "be heard to complain" about the Commissioner's "asserted biases" when the claimed biases were "known prior to the selection of the arbitrator." *Nat'l Hockey League Players' Ass'n v. Bettman*, 1994 WL 738835, at *13–14 (S.D.N.Y. Nov. 9, 1994). In such circumstances, courts reject challenges to league commissioners acting as arbitrators. *See, e.g.*, *id.*; *Commodore Tr.*, 16-674-BC, at 15–18 (rejecting challenge to the Commissioner's impartiality when challenger "had notice" of the claimed bias, and nonetheless provided "informed and knowledgeable consent to arbitration" before him); *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016)

34

(rejecting partiality challenge to NFL Commissioner as arbitrator, when parties knew of alleged bias and contracted for his authority over the disputes); *Hojnowski*, 995 F. Supp. 2d at 239 (similar). Here, Wildfire knowingly signed at least five (5) separate owners' consent agreements dating back over twenty years to 1999, including in connection with other ownership transactions, and in doing so, expressly agreed to arbitrate disputes like the present one fully and exclusively before the Commissioner.

Additionally, Wildfire's assertion that the Commissioner lacks impartiality because the NHL Board of Governors approved FSG's acquisition of a controlling interest in Lemieux LP is unpersuasive. Notwithstanding its express agreement to arbitrate its claims fully and exclusively before the Commissioner pursuant to the 1999 Consent Agreement and the NHL Constitution, Wildfire elected not to raise with the Commissioner any issues relating to FSG's two-step transaction at any time prior to the Board of Governors' vote on the matter,[69] even though Wildfire alleges that it knew of FSG's plans to acquire a controlling interest in Lemieux LP as far back as early-to-mid November 2021.[70] Wildfire does not provide any basis to conclude that the Board of Governors' vote reflects any prejudgment or rejection by the Commissioner of arguments that Wildfire may make as to the merits of this

---

[69] Zimmerman Decl. ¶ 22.

[70] Compl. ¶¶ 36–37.

dispute. In addition, Wildfire cannot rely on its own failure to submit this matter to arbitration before the Commissioner prior to the Board of Governors' vote as a basis to allege any pre-judgment of this matter, and thus, to challenge its express agreement to arbitrate disputes like the present fully and exclusively before the Commissioner.

Third, Wildfire's assertion that the Commissioner is not qualified to resolve this dispute is conclusory and contrary to the record. The current Commissioner has served in that position for nearly 30 years. The NHL asserts—and Plaintiff does not challenge—that over the course of his tenure, the Commissioner has been responsible for and integrally involved in, among other things, team-related ownership transactions, franchise expansion transactions, financing transactions, and other complex commercial transactions, including, for example, negotiating broadcasting agreements, collective bargaining agreements with the National Hockey League Players' Association and the National Hockey League Officials' Association, and contracts with material NHL licensees.[71] He also has mediated and arbitrated numerous disputes pursuant to his authority under the NHL Constitution and various owners' consent agreements, including, for example, as ordered by the Tennessee Chancery Court in *Commodore Trust*.[72] Finally, far from disqualifying

---

[71] Zimmerman Decl. ¶ 6.

[72] *Id.*

36

him as arbitrator, the Commissioner's role within the NHL and intimate knowledge of its business render him uniquely positioned to resolve disputes like the one presented here, as holders of ownership interests in Member Clubs, such as Wildfire and Defendants, acknowledge when they agree to resolve disputes fully and exclusively before him pursuant to the NHL Constitution. The dispute resolution provisions of the NHL Constitution, including Article 6.3(b)(5), are, in part, recognition by the Member Clubs of the value of maintaining autonomy over the NHL's internal affairs. Indeed, for this reason, courts have expressed an "unwillingness to intervene in matters that involve the business operations of professional sports organizations," including because "judicial intervention in such disputes" would unduly "interfer[e] with the [l]eague's autonomy in matters where the [league] and its commissioner have much greater competence and understanding than the courts." *Oakland Raiders v. Nat'l Football League*, 32 Cal. Rptr. 3d 266, 284 (Cal. Ct. App. 2005); *see also Crouch v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 845 F.2d 397, 402 (2d Cir. 1988) (similar); *Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 543 (7th Cir. 1978) (similar). Here, the Commissioner is well-suited to resolve Wildfire's claims, which likewise concern the business operations of the NHL, because the claims challenge the ongoing operation and control of one of the NHL's thirty-two member clubs. Accordingly, Wildfire cannot avoid the Commissioner's full and exclusive arbitral jurisdiction based on unsupported

37

assertions that the Commissioner is neither "neutral" nor "qualified" to resolve this dispute.[73]

## III.    CONCLUSION

For the foregoing reasons, the NHL's motion to compel arbitration of this dispute before the NHL Commissioner is granted, and this action is, accordingly, dismissed pursuant to Court of Chancery Rule 12(b)(1).

**IT IS SO ORDERED**.

---

[73] *See id.*, Ex. L at 1.